NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0007-13T1
            A-0259-13T1
            A-0404-13T1

CAROL JACOBY,

     Plaintiff-Respondent,

v.

ZONING BOARD OF ADJUSTMENT OF
THE BOROUGH OF ENGLEWOOD CLIFFS
and LG ELECTRONICS USA, INC.,

     Defendants-Respondents.

_____

MARCIA DAVIS,

     Plaintiff-Respondent,

and

NEW JERSEY STATE FEDERATION OF
WOMEN'S CLUBS, SCENIC HUDSON,
INC., MARGO MOSS and JAKOB
FRANKE,

     Plaintiffs-Appellants,

v.

BOARD OF ADJUSTMENT OF THE
BOROUGH OF ENGLEWOOD CLIFFS
and LG ELECTRONICS USA, INC.,

     Defendants-Respondents.

_____

> **APPROVED FOR PUBLICATION**
>
> **October 21, 2015**
>
> **APPELLATE DIVISION**

CAROL JACOBY,

    Plaintiff-Appellant,

v.

ZONING BOARD OF ADJUSTMENT OF
THE BOROUGH OF ENGLEWOOD CLIFFS
and LG ELECTRONICS USA, INC.,

    Defendants-Respondents.

_____

MARCIA DAVIS and NEW JERSEY STATE
FEDERATION OF WOMEN'S CLUBS,
SCENIC HUDSON, INC., MARGO MOSS,
and JAKOB FRANKE,

    Plaintiffs-Respondents,

v.

BOARD OF ADJUSTMENT OF THE
BOROUGH OF ENGLEWOOD CLIFFS
and LG ELECTRONICS USA, INC.,

    Defendants-Respondents.

_____

CAROL JACOBY,

    Plaintiff-Respondent,

v.

ZONING BOARD OF ADJUSTMENT OF
THE BOROUGH OF ENGLEWOOD CLIFFS
and LG ELECTRONICS USA, INC.,

    Defendants-Respondents.

_____

MARCIA DAVIS,

    Plaintiff-Appellant,

and

NEW JERSEY STATE FEDERATION
OF WOMEN'S CLUBS, SCENIC
HUDSON, INC., MARGO MOSS
and JAKOB FRANKE,

    Plaintiffs,

v.

BOARD OF ADJUSTMENT OF THE
BOROUGH OF ENGLEWOOD CLIFFS
and LG ELECTRONICS USA, INC.,

    Defendants-Respondents.

_____

Argued October 5, 2015 — Decided October 21, 2015

Before Judges Fasciale, Nugent and Higbee.

On appeal from Superior Court of New Jersey, Law Division, Bergen County, Docket Nos. L-2301-12 and L-2373-12.

Louis L. D'Arminio argued the cause for appellants New Jersey State Federation of Women's Clubs, Scenic Hudson, Inc., Margo Moss and Jakob Franke in A-0007-13 and respondents in A-0259-13 and A-0404-13 (Price, Meese, Shulman & D'Arminio, P.C. and Law Offices of Angelo C. Morresi, attorneys; Mr. D'Arminio, Kathryn J. Razin, and Angelo C. Morresi, on the briefs).

J. Alvaro Alonso argued the cause for appellant Carol Jacoby in A-0259-13 and respondent Carol Jacoby in A-0007-13 and A-0404-13 (Alonso & Navarette, L.L.C., attorneys; Mr. Alonso, on the brief).

Michael I. Lubin, argued the cause for appellant Marcia Davis in A-0404-13 and respondent Marcia Davis in A-0007-13 and A-0259-13.

Michael B. Kates argued the cause for respondent Zoning Board of Adjustment of Englewood Cliffs in A-0007-13, A-0259-13 and A-0404-13 (Kates, Nussman, Rapone, Ellis & Farhi, L.L.P., attorneys; Mr. Kates, of counsel and on the brief).

Nicholas G. Sekas argued the cause for respondent LG Electronics, USA, Inc. in A-0007-13, A-0259-13 and A-0404-13 (Sekas Law Group, L.L.C. and Day Pitney, L.L.P., attorneys; Mr. Sekas and Christopher John Stracco, on the brief).

Julien Neals, Bergen County Counsel, and Florio & Kenny, L.L.P., attorneys for amicus curiae County of Bergen, Kathleen Donovan, as Executive, and Bergen County Board of Chosen Freeholders in A-0007-13, A-0259-13 and A-0404-13 (James X. Sattely, Melissa Bristol Paolella, Frank P. Kapusinski and Edward J. Florio, on the briefs).

Eastern Environmental Law Center, attorneys for amicus curiae Mayor Paul H. Tomasko, Mayor Peter Rustin, Mayor Sophie Heymann and Mayor Paul Hoelscher in A-0007-13, A-0259-13 and A-0404-13 (Aaron Kleinbaum, on the brief).

Morningside Heights Legal Services, attorney for amicus curiae New Jersey Conservation Foundation, Natural Resources Defense Council, Coalition to Protect the Palisades Cliffs, Fort Tryon Trust, National Trust for Historic Preservation, New Jersey Sierra Club, New York/New Jersey Baykeeper, New York — New Jersey Trail Conference, Palisades Park Conservancy, Preservation League of New York State and Regional Plan Association in A-0007-13, A-0259-13 and A-0404-13 (Susan J. Kraham, Edward Lloyd, Mark Izeman of the New York bar, admitted pro hac vice, Albert Butzel of the New York bar, admitted pro hac vice, and William Cook of

the South Carolina bar, admitted pro hac vice, on the brief).

Bradley M. Campbell L.L.C., attorneys for amicus curiae New York State Senator Jeffrey D. Klein, United States Representative Eliot L. Engel, New York State Senator Adriano Espaillat, New York State Assemblyman Jeffrey Dinowitz and New York City Councilman Andrew Cohen in A-0007-13, A-0259-13 and A-0404-13 (Mr. Campbell, on the briefs).

Eric T. Schneiderman, Attorney General of the State of New York, attorney for amicus curiae the State of New York in A-0007-13, A-0259-14 and A-0404-13 (Oren L. Zeve, Assistant Solicitor General, on the brief).

The opinion of the court was delivered by

FASCIALE, J.A.D.

The New Jersey State Federation of Women's Clubs, Scenic Hudson Inc., Margo Moss, and Jakob Franke (the intervenors), Carol Jacoby, and Marcia Davis (Jacoby, Davis, and the intervenors are collectively referred to as plaintiffs), appeal from an August 9, 2013 order upholding defendant Board of Adjustment of the Borough of Englewood Cliffs' (the Board) site plan approval and grant of height and bulk variances to defendant LG Electronics USA, Inc. (LG).[1]  Margo Moss, Jakob

---

[1]   We calendared plaintiffs' appeals back-to-back, conducted oral argument on each appeal simultaneously, and have resolved them in one opinion due to the substantially overlapping issues
(continued)

Franke, Carol Jacoby, and Marcia Davis are residents in the community.

We granted amici status to numerous objectors to the granted height variance, including the State of New York; New York State Senator Jeffrey D. Klein; United States Representative Eliot L. Engel; New York State Senator Adriano Espaillat; New York State Assemblyman Jeffrey Dinowitz; New York City Councilman Andrew Cohen; New Jersey Conservation Foundation; Natural Resources Defense Council; Coalition to Protect the Palisades Cliffs; Fort Tryon Trust; National Trust for Historic Preservation; New Jersey Sierra Club; New York/New Jersey Baykeeper; New York — New Jersey Trail Conference; Palisades Park Conservancy; Preservation League of New York State; Regional Plan Association; Mayor Paul H. Tomasko; Mayor Peter Rustin; Mayor Sophie Heymann; and Mayor Paul Hoelscher.[2]

The primary dispute involves the Board's grant of a height variance allowing LG to construct a 143.8-foot office building in a business zone where the maximum permitted building height

---

(continued)
and contentions of the parties. As a result, these back-to-back appeals are consolidated for the purposes of this opinion.

[2] We also granted amici status to the County of Bergen, Kathleen Donovan, as Executive, and Bergen County Board of Chosen Freeholders, who supported the height variance.

is 35 feet.[3] The height of the building authorized by the variance dramatically affects the view of the historic Palisades Cliffs, a recognized natural treasure that has been intentionally preserved for decades. The opponents to the variance maintain that the building would ruin the natural beauty of the Palisades Cliffs because it would be visible on the west side of the Hudson River above the tree line from multiple vantage points in New York and New Jersey. The intervenors also challenge the issuance of the bulk variance reducing the number of required parking spaces.

We hold, where a structure substantially exceeds the local height restriction, that in determining whether the height of a building would be "consistent with the surrounding neighborhood[,]" a zoning board is obligated to consider the impact that the structure would have on more than the municipality itself or the immediate vicinity of the structure. The "special reasons" necessary to establish a height variance "must be tailored to the purpose for imposing height restrictions in the zoning ordinance." Here, because the proposed structure is in close proximity to the historic

---

[3]    The Board contends that the appeals are moot because the Borough of Englewood Cliffs amended the zoning ordinance after the judge entered the order, purportedly eliminating the need for a height variance. We need not consider this argument because the Borough repealed that ordinance in August 2014.

Palisades Cliffs and can be seen well beyond the immediate vicinity or municipality, established principles of zoning law direct that "surrounding neighborhood" means all reasonable visual vantage points.

We reverse the order upholding the granted height variance, and remand to the Board to conduct further proceedings consistent with this opinion, applying the enhanced standards of N.J.S.A. 40:55D-70(d)(6), and Grasso v. Borough of Spring Lake Heights, 375 N.J. Super. 41 (App. Div. 2004). We leave the details of the remand proceedings to the Board's discretion. We otherwise affirm the order upholding the bulk variance pursuant to N.J.S.A. 40:55D-70(c)(2).

I.

LG owns approximately 27 acres of land located at 111 Sylvan Avenue, Englewood Cliffs, otherwise known on a tax map as Block 207, Lot 6 (the property). The property sits atop the Palisades Cliffs and is approximately one mile north of the George Washington Bridge. The landscape is unmarked by man-made structures above the tree line.

LG planned to use the property as its North American Headquarters. LG intended to construct an eight-story building (the main building) divided into sections or wings (the project). Three proposed structures of the project exceeded

Englewood Cliffs' 35-foot maximum height limitation: the height of the main building would be 143.8 feet; a four-level garage would reach 48.8 feet; and a building situated between the north and south wings would be slightly over 35 feet tall. As a result, LG applied for a height variance.

LG proposed allocating fewer parking spaces for the project than the 2466 minimum spaces required by ordinance. Pursuant to LG's proposal, there would be a total of 1421 on-site parking spaces. Consequently, LG primarily sought a bulk variance to accommodate its parking plan.

The Board conducted six hearings between May and November 2011. LG produced testimony from two of its vice-presidents; an architect; a landscape architect; a professional planner; two professional engineers; and an environmental sustainability design expert. In opposition to the development, the executive director of the Palisades Interstate Park Commission (PIPC) testified that the height of the main building would visually impact the nearby Palisades Interstate Park (the "Park") and the overall scenic corridor of the Palisades Parkway. Other individuals expressed concerns that the project would visually affect the Palisades Cliffs and the Park's heritage.

A-0007-13T1

In February 2013, the Board adopted a resolution memorializing its six-to-one vote granting site plan approval and the requested variances. The Board found that

> [t]he building height enables substantially more landscape amenity and buffer features for nearby residents. The Board finds that the significant increase in landscape coverage alone justifies the height variance required. . . . In addition, the Board finds that the increased landscaping both conserves natural resources and prevents degradation of the environment and are special reasons for the grant of the height variance. The Board finds that the purposes of the Municipal Land Use Law [(MLUL), N.J.S.A. 40:55D-1 to -129] are advanced by [the] plan's height as adequate light[,] air and open space are preserved, and a desirable visual environment and the public welfare is promoted.
>
> 2. The building will be rated a LEED Gold building standard,[4] the second highest standard, just under Platinum, for energy use, recycling, and waste disposal. The project promotes the [MLUL's] purpose of promoting utilization of renewable energy resources.
>
> . . . .
>
> Th[e height] variance . . . is justified in part, by the extremely large lot size of 27 acres, the large amount of green space being increased from the present condition, and the large perimeter setbacks proposed. The

---

[4] A Leadership in Energy & Environmental Design (LEED) building standard refers to a building certification system whereby a building is rated based on its environmental impact, according to a point system. A Gold rating is the second highest to Platinum.

Board specifically finds that the increased height will create no detriments to the neighborhood, or to the zone plan. The increased height permits significant additional landscaping and green buffers, which shield the height from residences. The taller building is set far from residential lots. The benefits of granting the height variance outweigh any detriments. The building will not cast a shadow on adjacent properties. The Board finds that the applicant proved that the site can accommodate the negative effects associated with taller buildings particularly as the tall building is situated within a large, well[-]landscaped lot. The grant of the variance will not create a substantial detriment. The Board specifically finds that the design creates no detriments to the zone plan and zoning ordinance.

. . . .

13. The site plan fulfills the Master Plan goals of encouraging large[-]scale executive office development, reduc[ing] impervious coverage, and maintain[ing] a large lot size.

14. The project has no substantial detriment to the public good and no substantial impairment to the intent and purpose of the zone plan. The proposed number of square feet are significantly less tha[n] that permitted as of right, therefore there is no increased intensity of use proposed.

The Board then concluded that

[LG] has sustained [its] burden of showing special reasons warranting the grant of the requested height variances as well as a variance to permit a parking structure as an accessory use in the B[-]2 zone. The Board f[inds] that the height of the building

11

permit[s] [LG] to advance the purposes and objectives of the Master Plan, by enhancing landscaping and buffers, preserving environmentally sensitive areas such as wetlands and woodlands. Additionally [LG] also encouraged high[-]quality development without substantial detriment to public good and to the Master Plan's goals and objectives.

20.   The Board concludes that [LG] has sustained the burden of proof for the various bulk variances required for the project both by proving hardship under N.J.S.A. 40:55D-70(c)(1) and by proving that the proposal is a better zoning alternative under N.J.S.A. 40:55D-70(c)(2) by enabling increased green space and LEED Gold architecture. The provision of the parking garage will eliminate the existing condition of an asphalt parking lot covering most of the lot not covered by the building. The proposal will provide a 125[-]foot green setback at the Southern edge of the property.

21.   The Board also finds that [LG] has demonstrated that the required relief can be granted without substantial detriment to the public good and without substantially impairing the intent and purpose of the Zone Plan and Zoning Ordinance. The buildings will be of an attractive and tasteful design whose appearance will substantially enhance the surrounding area. The increased green space on the property will be a benefit for the neighborhood. The unrefuted expert testimony of [LG]'s traffic engineer was that there would be a negligible impact upon traffic from the project.

In granting the height variance, the Board required LG to lower the north garage by ten feet eight inches, and provide structural capacity for an additional level to be added in the

12

future.

Jacoby and Davis filed separate complaints in lieu of prerogative writs, challenging the Board's site plan approval and variance grants. The judge consolidated the complaints and conducted oral argument. The judge then granted the intervenors' motion allowing their participation, entered the order under review, and issued a written decision.

On appeal, plaintiffs separately present similar challenges.[5] Generally, plaintiffs argue the Board's grant of height and bulk variances must be reversed because the Board misapplied the applicable law and the judge erred in his legal conclusions. Specifically, plaintiffs maintain LG failed to satisfy its burden to prove the proposed structure was "consistent with the surrounding neighborhood" as LG did not address the impact of the development on the Palisades Cliffs and region. Plaintiffs ask us to reverse the August 9, 2013 order and set aside the variances.

---

[5] On September 22, 2015, intervenors' counsel, in preparation for oral argument before us, indicated that LG and intervenors entered into an agreement as to the height variance. Although LG apparently will now seek Board approval to construct a building lower than 143.8 feet tall, the agreed-upon reduction in height for a new building still exceeds the 35-foot height restriction. Jacoby and Davis are not part of the agreement between LG and intervenors. Consequently, we focus solely on the substantially interrelated contentions raised by the parties on appeal because resolution of the height dispute remains incomplete.

We begin by recognizing the general standards that inform our analysis. When reviewing a trial court's decision regarding the validity of a local board's determination, "we are bound by the same standards as was the trial court." Fallone Props., L.L.C. v. Bethlehem Twp. Planning Bd., 369 N.J. Super. 552, 562 (App. Div. 2004). We give deference to the actions and factual findings of local boards and may not disturb such findings unless they were arbitrary, capricious, or unreasonable. Id. at 560. In other words, a board's actions must be based on substantial evidence. Cell S. of N.J., Inc. v. Zoning Bd. of Adjustment, 172 N.J. 75, 89 (2002). However, a local board's "legal determinations are not entitled to a presumption of validity and are subject to de novo review." Wilson v. Brick Twp. Zoning Bd. of Adjustment, 405 N.J. Super. 189, 197 (App. Div. 2009).

### III.

As to the height variance, plaintiffs argue that the Board (1) misapplied N.J.S.A. 40:55D-70(d)(6) and the standards expressed in Grasso; and (2) erroneously rejected the contention that the height variance constituted impermissible rezoning of the property. We need not address whether the variance constituted an illegal rezoning of the property because we agree

with plaintiffs that the Board did not properly apply (d)(6) and Grasso.

In 1991, the Legislature placed height variances within the enhanced standards of N.J.S.A. 40:55D-70(d). Grasso, supra, 375 N.J. Super. at 50. The Legislature believed that a (d) variance had a "greater potential for disrupting a municipality's zone plan" because "the resulting structure arguably could be seen as something out of character with the structures permitted in the zone . . . ." Id. at 51 (quoting Engleside at W. Condo. Ass'n v. Land Use Bd., 301 N.J. Super. 628, 639 (Law Div. 1997)).

LG's height variance application pertaining to its proposed eight-story, 143.8-foot, main building is therefore governed by N.J.S.A. 40:55D-70(d)(6), which states in pertinent part that

> [i]n particular cases for special reasons, [a board may] grant a variance to allow departure from regulations . . . to permit: (1) a use or principal structure in a district restricted against such use or principal structure . . . or (6) a height of a principal structure which exceeds by 10 feet or 10% the maximum height permitted in the district for a principal structure.

In Grasso, we explained generally that an applicant seeking a (d)(6) variance must show (1) "special reasons," or the so-called positive requirement; and (2) that the variance can be granted "without substantial detriment to the public good and will not substantially impair the intent and the purpose of the

zone plan and zoning ordinance," or the so-called negative requirement. Grasso, supra, 375 N.J. Super. at 48-49 (quoting N.J.S.A. 40:55D-70(d)[(6)]).

(i).

As to the positive requirement necessary to justify granting a height variance under (d)(6), LG may establish "special reasons" by showing undue hardship or establishing that the 143.8-foot main building did not offend any purposes of the height restriction and "would nonetheless be consistent with the surrounding neighborhood." Id. at 50-53.

To demonstrate undue hardship, and applying the enhanced standards for (d)(6) variance applications imposed by the Legislature, LG must show that

> the property for which the variance is sought cannot reasonably accommodate a structure that conforms to, or only slightly exceeds, the height permitted by the ordinance. Stated differently, the applicant for a (d)(6) variance on grounds of hardship must show that the height restriction in effect prohibits utilization of the property for a conforming structure.

> [Id. at 51.]

LG's architect conceded at the hearings that LG did not consider alternatives to the project configuration. The Board did not address or find that a conforming building, or one that "slightly exceeds" the thirty-five-foot height limitation, could

A-0007-13T1

not be constructed on the site.  The Board could not make such a finding because a conforming structure existed on the site when LG had applied for the height variance.  Thus, LG failed to establish undue hardship.

As to whether the main building would be "consistent with the surrounding neighborhood[,]" we have previously indicated that the "special reasons" necessary to establishing a height variance "must be tailored to the purpose for imposing height restrictions in the zoning ordinance."  Id. at 52-53.  In all likelihood, the thirty-five-foot height restriction is designed to preserve views of the skyline and trees, avoid the appearance of overcrowding that could result from tall buildings, and maintain the existing character of the Palisades Cliffs.  As we acknowledged in Grasso, "an excessively tall structure can aesthetically impair a municipality."  Id. at 53.  Here, the eight-story, 143.8-foot building far exceeds the existing 35-foot limitation; indeed, it is over four times the height limitation.  Such a large-scale deviation will undoubtedly have a visual effect on the area, especially because of the placement of the building in close proximity to the Palisades Cliffs, a historic, renowned natural and dramatic geological feature on the west side of the Hudson River.

A-0007-13T1

We have long recognized that a zoning board's duty to consider the "surrounding neighborhood" encompasses more than just consideration of the municipality itself or the immediate vicinity of the structure.  See Urban Farms, Inc. v. Franklin Lakes, 179 N.J. Super. 203, 213 (App. Div.) (explaining that "[t]he insularity and parochialism of the Chinese wall theory of municipal zoning has long since been discredited"), certif. denied, 87 N.J. 428 (1981).  Indeed, it is the intended purpose of the MLUL "[t]o ensure that the development of individual municipalities does not conflict with the development and general welfare of neighboring municipalities, the county and the State as a whole."  N.J.S.A. 40:55D-2(d).  The MLUL also seeks

> [t]o provide sufficient space in appropriate locations for a variety of agricultural, residential, recreational, commercial and industrial uses and open space, both public and private, according to their respective environmental requirements in order to meet the needs of all New Jersey citizens[.]
>
> [N.J.S.A. 40:55D-2(g).]

Even prior to the formal adoption of the MLUL, New Jersey case law established these fundamental principles.  As early as 1949, our Supreme Court recognized that

> the most appropriate use of any particular property depends not only on all the conditions, physical, economic and social, prevailing within the municipality and its

A-0007-13T1

needs, present and reasonably prospective, but also on the <u>nature of the entire region</u> in which the municipality is located and the use to which the land in that region has been or may be put most advantageously.

[<u>Duffcon Concrete Prods., Inc. v. Cresskill</u>, 1 <u>N.J.</u> 509, 513 (1949) (emphasis added).]

In <u>Quinton v. Edison Park Development Corp.</u>, 59 <u>N.J.</u> 571 (1971), a town granted permission to a company to build at the edge of town without a "buffer strip," as required by municipal law, reasoning that the buffer strip was designed to protect its own residents, not the other town's residents. <u>Id.</u> at 573-74. The Court rejected this argument and explained that New Jersey "cases have long recognized the duty of municipal officials to look beyond municipal lines in the discharge of their zoning responsibilities." <u>Id.</u> at 578. The Court concluded that the adjoining town's residents were entitled to the same protection via the buffer strip as were the town's own residents. <u>Id.</u> at 579-80. <u>See also</u> <u>Cresskill v. Dumont</u>, 15 <u>N.J.</u> 238, 247 (1954) (rejecting the argument "that the responsibility of a municipality for zoning halts at the municipal boundary lines without regard to the effect of its zoning ordinances on adjoining and nearby land outside the municipality"). "Clearly, it is a virtual truism of the modern land-use canon that zoning ordinances must be regionally oriented in their provisions,

prohibitions and concerns." Urban Farms, supra, 179 N.J. Super. at 213.

Finally, although not binding on us, we find persuasive that in Knight v. Bodkin, 344 N.Y.S.2d 170, 172 (App. Div. 1973), a New York court struck down a zoning board's decision, in part, because of the effect on surrounding historical and scenic areas. The court reasoned that allowing a manufacturing plant to operate in the "historic Hudson Valley" was impermissible because

> Tallman Mountain State Park, one of [sixteen] parks in the chain which makes up the magnificent Palisades Interstate Park, is visited annually by several millions of persons and, as heretofore mentioned, is opposite the proposed factory and accessible from Route 9-W. A chain factory in this area would surely be incongruous and would, without question, sharply alter the character of the area.
>
> [Id. at 176.]

Thus, the MLUL and case law make clear that a zoning board must consider more than just the effect of the decision on its own municipality, it must take into account "the entire region." Here, the Board is obliged to consider the effect of the proposed height variance on the surrounding municipalities affected by the decision. In accordance with the reasoning of Knight, and in furtherance of the zoning board's duty to consider more than just the municipality itself or the immediate

vicinity of the structure, we conclude that the Board insufficiently considered the main building's effect on the general landscape, as this case involves a well-known, heavily visited, and treasured area.

There is ample evidence in the record of the visual impact that the proposed structure will have on the Palisades Cliffs and Park. The Director of the PIPC testified at a November 14, 2011 hearing that the height of the building would have a "visual impact on the [P]ark, the scenic corridor, the scenic by-way corridor of the parkway, as well as it[s] national register listing." A member of the public testified regarding the park's rich history and the commitment by both local and national politicians to preserve the cliffs, which led to the creation of the PIPC. Amici have also expressed concern regarding the park's history and the efforts by citizens of both New York and New Jersey to maintain the cliffs in the late 1800s, and the resulting commitment by both New York and New Jersey to preserve the cliffs, leading to a compact between the two states to maintain the land. The testimony, therefore, reflected compelling reasons for the Board to more fully consider the effect that the height variance would have on the preservation of this historical landmark in the context of a

21

clear policy to maintain and preserve the cliffs, and maintain them as a scenic resource.

In finding "special reasons," the Board did not sufficiently determine that the excessive height of the main building would be compatible with the "surrounding neighborhood." It did not adequately consider whether the proposed height variance was tailored to the purpose for which the height restriction was imposed. It omitted any meaningful reference to the height of the buildings in the "surrounding neighborhood." Although the Board referenced buildings near Saint Peter's College, it did not identify the distance from the college to the site. The Board also failed to fully address whether the main building, which was four times the height limitation imposed by ordinance, would be out of character with other buildings in the B-2 zone.

Rather, the Board found that advancing the purposes of the Borough's master plan, by enhancing the landscaping, buffers, and environmentally sensitive areas, as well as by encouraging high-quality development, constituted sufficient special reasons for the height variance. Such a finding, however, did not satisfy the enhanced positive requirement of (d)(6), as further explained in <u>Grasso</u>. Therefore, the Board misapplied LG's obligation to show "special reasons."

As to the negative criteria, LG must show, pursuant to (d)(6), that the variance can be granted "without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance." That is so because a substantial height variance, like here, has the potential to disrupt the municipal zone plan. N. Bergen Action Grp. v. N. Bergen Twp. Planning Bd., 122 N.J. 567, 576 (1991).

The Board noted that the buffer zone on the southerly end of the property, the elimination of surface parking, and the increased greenery on the site, mitigate any substantial detriment to the public good as a result of the height of the building. The Board's findings solely relating to the aesthetic benefits of the project do not constitute a full consideration of LG's application on the zoning scheme. In other words, the Board failed to adequately consider the negative criteria for a height variance exceeding four times the permitted height in the B-2 zone.

The Board made no meaningful findings as to the intent and purpose of the zone plan and zoning ordinance as required by Grasso, interpreting N.J.S.A. 40:55D-70(d). The Board was obliged to consider the reason for the thirty-five-foot height

limitation and make specific findings as to how the proposed variance conforms to the intent and purpose of the zoning plan. See Coventry Square, Inc. v. Westwood Zoning Bd. of Adjustment, 138 N.J. 285, 299 (1994) (explaining that the second prong of the negative criteria requires the Board "be satisfied that the grant of the conditional-use variance for the specific project at the designated site is reconcilable with the municipality's legislative determination that the condition should be imposed on all conditional uses in that zoning district").

Our Supreme Court, in Medici v. BPR Co., 107 N.J. 1, 22 (1987), explained that the negative criteria are designed to act as a safeguard against improper use of variance power. To that end, mere conclusory recitations of statutory language will be vulnerable to attack for failing to meet the negative criteria. Id. at 23. Instead, a board resolution

> should contain sufficient findings, based on the proofs submitted, to satisfy a reviewing court that the board has analyzed the master plan and zoning ordinance, and determined that the governing body's prohibition of the proposed use is not incompatible with a grant of the variance.
>
> [Ibid.]

This inquiry is especially important here because LG proposed that the project be constructed hundreds of feet from an area abundant with the historic natural resources of the

Palisades Cliffs. The Board's resolution does not reference the Palisades Cliffs or Park or the impact that the main building would have on them or the zone plan.

The Board heard testimony reflecting serious concerns about the overall effect LG's project and main building would have on the sweeping views of the Palisades Cliffs and Park. The record reflects that the main building could be seen above the tree line from the George Washington Bridge, points in the Park, and from points in New York. We conclude that by failing to address the historic and scenic importance of the unique location of the proposed project, the Board did not properly determine whether the main building could be constructed "without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance." N.J.S.A. 40:55D-70(d)(6).

## IV.

As to the bulk variance, intervenors contend that the Board incorrectly applied the MLUL. The intervenors argue that LG was improperly granted a bulk variance for the number of parking spaces because LG failed to establish that the physical condition of the property prevented them from conforming to the bulk requirements. According to the intervenors, the bulk variance sought was the result of LG's choice of design, and did

not advance the purposes of the MLUL sufficiently to outweigh the detriment to the surrounding area.

They further argue that LG was not entitled to a bulk variance for the parking spaces under N.J.S.A. 40:55D-70(c)(1) because LG created the hardship necessitating the variance. We conclude that LG was entitled to the bulk variance under N.J.S.A. 40:55D-70(c)(2) because the variance advanced the purposes of the MLUL and did not act as a detriment to the zone plan or ordinance.

Regarding bulk variances, N.J.S.A. 40:55D-70(c) states that the zoning board has the power:

> (1) Where: (a) by reason of exceptional narrowness, shallowness or shape of a specific piece of property, or (b) by reason of exceptional topographic conditions or physical features uniquely affecting a specific piece of property, or (c) by reason of an extraordinary and exceptional situation uniquely affecting a specific piece of property or the structures lawfully existing thereon, the strict application of any regulation . . . would result in peculiar and exceptional practical difficulties to, or exceptional and undue hardship upon, the developer of such property, grant . . . a variance from such strict application of such regulation so as to relieve such difficulties or hardship; (2) where in an application or appeal relating to a specific piece of property the purposes of this act . . . would be advanced by a deviation from the zoning ordinance requirements and the benefits of the deviation would substantially outweigh any detriment, grant

A-0007-13T1

a variance to allow departure from [such] regulations . . . .

A (c)(1) variance requires a showing of hardship related to the physical characteristics of the land or the existing structure. Lang v. Zoning Bd. of Adjustment, 160 N.J. 41, 52 (1999). Hardship personal to the applicant, such as financial hardship, is not sufficient; the hardship must arise out of the specific condition of the property. Id. at 53-54. The focus of the inquiry should be on whether the unique property condition relied on by the applicant constitutes the primary reason why the proposed structure does not conform to the ordinance. Id. at 56.

Where the hardship has been created by the applicant, a (c)(1) variance will normally be denied. Jock v. Zoning Bd. of Adjustment, 184 N.J. 562, 591 (2005). A (c)(1) variance is not available to provide relief from a self-created hardship. Chirichello v. Zoning Bd. of Adjustment, 78 N.J. 544, 553 (1979). Here, the hardship was self-created. LG chose to reduce the number of parking spaces; the condition of the property did not demand it. Therefore, we conclude that the Board erred by finding that LG met the requirements of a (c)(1) variance.

A (c)(2) variance contemplates that even absent proof of hardship, a bulk or dimensional variance that advances the

purposes of the MLUL may be granted if the benefits of the deviation outweigh any detriment. <u>Lang</u>, <u>supra</u>, 160 <u>N.J.</u> at 57. A (c)(2) variance should not be granted when merely the purposes of the applicant will be advanced; rather, the grant must actually benefit the community in that it represents a better zoning alternative for the property. <u>Kaufmann v. Planning Bd.</u>, 110 <u>N.J.</u> 551, 563 (1988). This "broadened" (c) variance affects "a very narrow band of cases in which the standard would fall somewhere between the traditional standards of 'hardship,' on the one hand, and 'special reasons,' on the other." <u>Id.</u> at 560-61.

To establish a (c)(2) variance, the applicant must show that the purposes of the MLUL would be advanced, the variance can be granted without substantial detriment to the public good, the benefits of the variance will outweigh any detriment, and that the variance will not substantially impair the intent and purpose of the zoning plan and ordinance. <u>Wilson v. Brick Twp. Zoning Bd. of Adjustment</u>, 405 <u>N.J. Super.</u> 189, 198 (App. Div. 2009). It is the applicant's burden to produce this evidence. <u>Trinity Baptist Church v. Louis Scott Holding Co.</u>, 219 <u>N.J. Super.</u> 490, 500 (App. Div. 1987).

Here, reduction in the number of parking spaces will promote a desirable visual environment, <u>N.J.S.A.</u> 40:55D-2(i), by

eliminating surface asphalt parking, and will prevent a degradation of the environment, N.J.S.A. 40:55D-2(j), by eliminating the stormwater runoff to the residential neighborhood to the south through the planting of an added tree buffer in place of the asphalt parking. Thus, replacing the surface parking with parking decks and trees creates an opportunity for improved zoning and planning that will benefit the community. Kaufmann, supra, 110 N.J. at 563.

The negative criteria of a (c)(2) variance focus on the surrounding properties. Id. at 565. A (c)(2) variance will stand if, after adequate proofs are presented, the Board concludes that the "harms, if any, are substantially outweighed by the benefits." Ibid. The Board's grant of the bulk variance is based on substantial evidence. Elimination of surface parking will improve the site's drainage, aid in creating a larger buffer to the south, and provide an aesthetic improvement. There is no evidence that the reduction in the number of parking spaces will increase the amount of off-site parking because many employees will be working off site and because there is public transportation available. Therefore, LG satisfied the negative criteria.

In light of our conclusions, we need not reach plaintiffs' remaining contentions, that the court erred by using an improper

standard of review and the Board provided an incorrect address as to where the initial hearing would occur.

Reversed in part and affirmed in part. We remand for further proceedings on the height variance consistent with this opinion and applicable law. If LG's agreement with intervenors means that LG will now abandon on remand any further efforts to obtain a height variance for the 143.8-foot main building, then LG may seek another height variance if it plans to construct a different building which exceeds the 35-foot height restriction. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION