**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3864-22

ET MANAGEMENT &
INVESTORS, LLC,

     Plaintiff-Respondent,

v.

THE ZONING BOARD OF
ADJUSTMENT OF THE
TOWNSHIP OF WEEHAWKEN,

     Defendant-Appellant.

_____

Submitted September 19, 2024 – Decided October 10, 2024

Before Judges Mawla, Natali, and Vinci.

On appeal from the Superior Court of New Jersey,
Law Division, Hudson County, Docket No.
L-3759-22.

Florio Kenny Raval, LLP, attorneys for appellant
(Christopher K. Harriott, of counsel and on the briefs).

J. Alvaro Alonso, LLC, attorneys for respondent (J.
Alvaro Alonso, on the brief).

PER CURIAM

Defendant Zoning Board of Adjustment of the Township of Weehawken (Board) appeals from the June 19, 2023 Law Division order reversing the Board's denial of plaintiff ET Management & Investors LLC's application for site plan approval and variances, and the July 21, 2023 order denying its motion for reconsideration.  Based on our review of the record and the applicable legal principles, we affirm.

I.

Plaintiff owns property identified as "Block 25, Lots 8 and 9," commonly known as 115-117 Hackensack Plank Road, in Weehawken (the property).  On February 10, 2020, plaintiff applied for final site plan approval and variances for a four-story, ten-unit multi-family residential building (the project).  The property is in the R-4 Residential District, where a multi-family residential building is a permitted use.

The project includes a glass lobby and automated parking system on the ground floor, a mezzanine level above the lobby to be used as an amenity space, and three residential floors starting on the second floor.  The second floor contains one two-bedroom and three one-bedroom units; the third and fourth floors contain three two-bedroom units.

The application sought variances for height and density, as well as bulk

2

variances for lot width, side yard setback, lot coverage, landscaping, and parking.[1]  Specifically, the application sought variances for density because 5.3 residential units are allowed but ten are proposed, and parking because nineteen spaces are required but twelve are proposed.

On October 27, and November 10, 2020, the Board held hearings on plaintiff's application.  Plaintiff presented expert testimony from its project architect, John Nastasi, two traffic engineers, Corey Chase and Craig Peregoy, and a professional planner, John McDonough.  The Board relied on testimony from its planner, Jill A. Hartmann, and a September 20, 2020, report she prepared for the Board.[2]

Nastasi testified there are currently three structures on the property including a house, garage, and multifamily structure that "sits on . . . the rear property line and the west property line" that would be replaced by a single, three-story building with a twenty-foot rear yard setback.  The "[twenty]-foot rear yard opening [would allow] the neighbors behind . . . and to the west . . . a

_____

[1]  On appeal, the Board addresses only the variances for density and parking.  All other issues are waived.  Green Knight Cap., LLC v. Calderon, 469 N.J. Super. 390, 396 (App. Div. 2021) (quoting Woodlands Cmty. Ass'n v. Mitchell, 450 N.J. Super 310, 319 (App. Div. 2017)).

[2]  Hartmann's report is not included in the appellate record.  We will rely on the Board's summary of her testimony and report.

clear view out." According to Nastasi, the project includes tones, materials, and architecture that fit with the scale and character of the neighborhood and make "it . . . feel like a nice bookend with the beautiful historic building" to the east.

The project incorporates a twenty-four-foot driveway to accommodate two-way traffic, an automated parking lift system for eleven vehicles at the rear of the property, and an additional accessible parking stall near the lobby, for a total of twelve parking spaces. Nastasi testified he previously used the automated parking system in multiple buildings and "it has become the industry standard." It is a mechanical system not unlike an elevator, and if there is a maintenance problem the maintenance company deploys repair people to the site the same day.

Chase, a traffic engineer, testified he conducted a "traffic impact study" to assess the effect the project would have on traffic in the area and opined it would be "a very low traffic generator." His study was conducted according to the trip generation projections published by the Institute of Transportation Engineers (ITE), which is the national and state standard for developing traffic projections for a residential development. Chase testified the proposed ten residential units would generate less than five trips during peak commute hours.

Chase also testified he performed a "pre- and post-development level of

A-3864-22

service analysis at the adjacent signalized intersection of Hackensack Plank Road and Gregory Avenue" and concluded, "due to the limited traffic impacts associated with the [project], there [would be] no degradations in level of service between the pre- and post-development conditions." In other words, "the signalized intersection at Hackensack Plank Road and Gregory Avenue would continue to operate in the same manner [in] which it does today with or without the proposed [project]."

Chase testified although Residential Site Improvement Standards (RSIS) indicate the project would require nineteen parking spaces, "[RSIS] only provide[s] one parking requirement for the entire state of New Jersey." He noted RSIS acknowledges "different conditions warrant alternate parking requirements." He testified, according to the data from the United States Census Bureau for Weehawken and the particular census tract the property is located in, "the number of vehicles parked per rental unit is 0.92 . . . within the township," and "1.06 vehicles per rental unit" within the census tract. Based on that data, Chase opined only nine to eleven parking spaces are necessary and twelve parking spaces would be "more than adequate" for the project. Chase testified the site could accommodate the loading and unloading of trucks by utilizing the driveway and two-way, twenty-four-foot driveway.

A-3864-22

On November 10, Chase was unavailable and Peregoy, a traffic engineer, testified regarding the driveway and automated parking system. He explained the twenty-four-foot driveway would accommodate delivery, repair, and utility vehicles because they could park on one side of the drive aisle and leave "a [seventeen-foot-width]" for other vehicles to pass. In addition, there is a parking lane in front of the property where delivery vehicles, such as Amazon and UPS, could stop to make deliveries without blocking traffic. Peregoy also played a video demonstrating how the automated parking system works and testified such systems are "becoming more and more common" and "seem to be very effective."

McDonough testified the property is comprised of two oversized lots, which combined to form an oversized lot just under 6,000 square feet, thirty-three percent larger than required in the zone. According to McDonough, both lots are currently over-developed. "Lot 8 is developed with . . . a non-conforming garage accessory structure in the front yard [that] . . . is directly in line with the back yards of . . . four or five homes . . . ." The project would replace the existing structure with open space, eliminate the non-conforming condition, and provide a rear yard that conforms with the zoning requirements. Lot 9 is developed with a house that has no parking.

6

The lots are adjacent to a parking lot on one side and an older house on the other. There is an eight-story housing project building to the rear, a four-story building "behind the site on the next street," and a building that varies between three and four stories in front. McDonough testified the project would not "pierce the skyline or create a skyline" or "create something . . . distinctly different than some of those other buildings . . . in the neighborhood," but would blend into the area around it. There is currently very limited capacity for service vehicles on the street and the project "actually mak[es] that better by providing some pull-off space."

McDonough testified the project is for a permitted use in the R-4 district, and the lot dimensions of area and depth, the number of stories, and the front and rear-yard setbacks conform with the applicable zoning ordinances. The project requires a variance for width because the property is forty-five and one-half feet where fifty feet is required, but that is an existing condition.

McDonough also testified side yard setback relief is required because twelve feet is needed, and the application calls for zero feet on the side that abuts the parking lot and three and one-half feet on the other side. However, the side yard setback for a conforming one, two, or three family dwelling is only three feet, and the three and one-half foot setback is not "substantially different than

A-3864-22

what could be realized" under a different conforming plan.  As for lot coverage, the existing lot is "substantially covered over now," and the proposed seventy-two percent coverage would be an "overall site betterment[] . . . ."

McDonough testified the density variance is required because the proposed density is seventy dwelling units per acre where forty are permitted. Regarding the density variance, McDonough testified plaintiff meets the statutory test for relief under Grubbs v. Slothower, 389 N.J. Super. 377 (App. Div. 2007), after weighing the positive and negative criteria.  As to the positive criteria, McDonough testified the project:  (1) promotes the general welfare by creating new more efficient and modern housing and advances the goal of providing a desirable living environment; (2) proposes a use of the property more in harmony with the area than leaving the two lots with the existing conditions; (3) promotes a more desirable visual environment; and (4) promotes the efficient use of land.

Addressing the negative criteria, McDonough testified the project accommodated any problems associated with the additional density including: parking, utilities, construction, storm water control, buffering, fire safety, building code, aesthetics, accessibility, and appropriate unit size.  McDonough also testified the proposed density of approximately seventy dwelling units per

8

acre is in harmony with the neighborhood because there is a variety of density types in the area. Specifically, he testified:

> Block 32, [l]ot 5 . . . has a density of [seventy] dwelling units per acre . . . . [N]eighboring [l]ot 10, there[is] density equivalence of [eighty] dwelling units per acre. And then . . . the . . . condos [at 85 Maple Avenue], which is a new multi-family development less than ten years old. Same zone. Just a chip shot away from the subject site. We[are] looking [at seventy-one] dwelling units per acre. So . . . the [seventy]-plus units per acre that the [a]pplicant is proposing here is not out of character with other developments . . . in the area here.

The height variance is required because the proposed height is forty-eight feet where forty feet is permitted. According to McDonough, the additional height is required to provide additional parking and accommodate the amenity space in the mezzanine level. As to the positive criteria, he testified this increase is not a substantial departure from the intent and purpose of the zoning plan, and it provides for an amenity inside the building that promotes wellness and public health. As to the negative criteria, he opined the extra height will not block scenic views, will blend with the variable building heights in the area, will not give one property an advantage over another, and will create an open space in the back of the site.

With respect to the bulk variances, McDonough testified the relief is justified under the flexible "c" variance test. N.J.S.A. 40:50D-70(c)(2). The

9

setback relief is not substantially different than a conforming development, and the lot coverage is not substantially different than what is currently there and is mitigated by the proposed engineering improvements. With respect to parking, McDonough testified the supply will meet the demand and the site will function safely and efficiently. Overall, McDonough testified the project "is consistent with good planning principles" and "certainly meets the statutory criteria for all . . . the relief [sought] . . . ." He continued, "[t]he project is not going to create overcrowding, overdevelopment, or an imposing structure that is going to overwhelm the area, but in fact . . . will blend very well."

The Board also heard comments from several members of the public, both for and against the application. Some expressed concern over the size of the proposed building; the adequacy of parking; and the impact on the surrounding area and traffic.

After the close of the November 10, 2022 public hearing, the Board voted unanimously in favor of a motion to deny the application because it "does not have significant enough or adequate . . . parking for [the] area."

On January 26, 2021, the Board adopted a resolution memorializing its decision to deny the application (the January 2021 Resolution). The resolution summarized the testimony of plaintiff's expert witnesses and noted it "relie[d],

in part, upon the testimony . . . of . . . Hartmann, . . . who testified as to each of the variances sought . . . as well as the deficiencies in the [a]pplication . . . ." The Board determined, "the variances sought would be a substantial detriment to the public good and that the benefits do not outweigh the detriments that would result from . . . the proposed project."

Specifically, the Board noted:

> The proposed mechanical parking is insufficient for the proposed number of units and the limited public parking in the area (both on and off-street) will not accommodate the additional vehicles that the [p]roject will bring to the immediate neighborhood both from residents and visitors. The Board did not find the proposed driveway to be a sufficient alternative and believed [it] created as many problems as it solved. It has also been determined that the [p]roject cannot accommodate the problems created by the proposed increased density, specifically with respect to traffic circulation, off-street parking[,] and the impact on the surrounding properties with respect to building coverage and side yard setbacks. Given the existing traffic conditions, the limited availability of public parking in the area . . . and the surrounding properties, the proposed structure is simply too large for the neighborhood.

Plaintiff filed a complaint in lieu of prerogative writs challenging the Board's denial of its application. On June 21, 2022, the court held a trial and determined, in an oral opinion, the January 2021 Resolution failed to set forth an adequate factual basis for the Board's decision. The court noted the basis for

the Board's denial was "parking and traffic issues caused by the size and density of the project," but the January 2021 Resolution did not set forth any facts to support that determination. Rather, the evidence summarized therein supported plaintiff's contention that the project provided sufficient on-site parking. By order dated June 22, 2022, the court vacated the January 2021 Resolution and remanded the matter for the Board to adopt a new resolution based on the existing record.

On August 23, 2022, the Board adopted an amended resolution, again denying plaintiff's application. The amended resolution is substantially identical to the January 2021 Resolution, except it notes the Board relied on Hartmann's September 20, 2020, report and summarized her testimony as follows:

> Hartmann testified that the proposed twelve . . . off-street parking spaces w[ere] insufficient where nineteen . . . spaces are required and noted that the stacked, mechanical parking system proposed . . . was not recognized by [Weehawken] and/or [the] Board (resulting in only five . . . official off-street parking spaces) and would not be able to accommodate visitors or trucks or larger vehicles, even with the use of the driveway, as there [are] no dedicated spots for visitors or vendors. She also testified that the issue of parking [is] further exacerbated by the fact that on-street parking is permitted [on] only one side of Hackensack Plank Road, that there [are] no more than five . . . off-street parking spaces [in the immediate area] and that

the [p]roject would actually eliminate [two] on-street spaces in front of it on Hackensack Plank Road. Hartmann further testified, with respect to density, that she did not believe there was adequate site circulation and that she was concerned about the proximity to the residential buildings [in the area] . . . . Given the small side yard setback and the fact that the [p]roject is significantly taller than those buildings, . . . [Hartmann] testified that she believed that was an impact on neighboring structures. She also testified that while 85 Maple Avenue may have a similar density to the [p]roject, there is significantly more parking available at 85 Maple Avenue, which proposed a redevelopment of existing industrial use that is significantly different than the residential use of the [p]roject.

The Board noted it "disagree[d] with . . . Nastasi's contention that the mechanical parking space and adjacent driveway are sufficient to accommodate the parking needs of the site" and "given its particular knowledge and expertise regarding local traffic and parking conditions, [it] disagree[d] with the contentions of the [a]pplicant's traffic experts regarding the [p]roject's impact on thereupon."

The Board added:

> Given the issues with parking, both on street and off-street, and site circulation, [it] reject[ed] [McDonough's] contention that benefits of granting the parking variance outweighed the detriments of so doing. Moreover, given its substantially taller height, and its proximity to adjacent buildings, and the testimony of neighboring residents, [it] reject[ed]

[McDonough's] contention that the height was appropriate and not a substantial departure from the intent of the [o]rdinance. Likewise, [it] disagree[d] that the site can handle the problems associated with the increased density to almost double what is permitted in that zone.

Plaintiff filed a second complaint in lieu of prerogative writs challenging the Board's second denial of its application. On June 1, 2023, the court held a trial and again reversed the Board's decision in an oral opinion.

The court found:

[T]he evidence as addressed in the amended resolution was overwhelmingly in favor of the applicant. There is no explanation in the amended resolution as to the reasons for rejecting . . . all three experts that were presented by the applicant, the amended resolution just says, we disagree, we disagree, we disagree. . . .

Simply saying, I do[not] care what your expert says, I disagree is, by definition, arbitrary and capricious and unreasonable.

The court also noted if the Board chooses to ignore expert testimony, it needs to:

[G]ive a rational, reasonable, articulable basis based upon evidence in the record as to why [the Board is] rejecting it, i.e., the expert assumed facts that are incorrect. Here[are] the facts that were wrong. And therefore, because of that[,] [the Board is] not relying on that expert opinion. . . . [G]ood rational reasons to reject an expert opinion besides nothing else but, I disagree, I disagree.

A-3864-22

After remanding the matter, the court expected to "get an amended resolution back" explaining why plaintiff's traffic expert's conclusions were incorrect. Instead, "[t]he amended resolution . . . states that 'given its particular knowledge and expertise, i.e., the personal beliefs of a [B]oard member, regarding local traffic and parking conditions, the [B]oard disagrees with the contentions of the applicant's traffic experts . . . plural, regarding the project's impact on the community.' That[is] not enough."

The court determined,

> there [are] no factual findings of the [Board] in this amended resolution except to say, we do[not] like those opinions so we[ are] going to reject all of them. They relied upon [Hartmann's] opinion, a planner, she[is] not even a traffic expert, to find that the parking [proposed] was insufficient.

Ultimately the court found, "[t]here is nothing in [the amended resolution] that would rationally support the [B]oard's . . . decision to reject so many expert qualified witnesses' testimony in favor of this application."

On June 19, 2023, the court entered an order reversing the Board's denial of ET Management's application for the reasons set forth in its June 1, 2023 oral opinion. On June 29, 2023, the Board moved for reconsideration, which the court denied by order entered July 21, 2023.

On appeal, the Board argues the court erred in finding its decision was arbitrary, capricious, and unreasonable. Specifically, the Board argues its findings of fact and legal conclusions were sufficient to support its denials of the density and parking variances. The Board also contends the court erred in rejecting the testimony of its professional planner.

We affirm substantially for the reasons set forth in the court's June 1, 2023 oral opinion. We add the following comments.

II.

"When reviewing a trial [judge's] decision regarding the validity of a local board's determination, 'we are bound by the same standards as was the trial [judge].'" Jacoby v. Zoning Bd. of Adj. of Borough of Englewood Cliffs, 442 N.J. Super. 450, 462 (App. Div. 2015) (quoting Fallone Props., LLC v. Bethlehem Twp. Plan. Bd., 369 N.J. Super. 552, 562 (App. Div. 2004)). "[W]hen a party challenges a . . . board's decision through an action in lieu of prerogative writs, the . . . board's decision is entitled to deference." Kane Props., LLC v. City of Hoboken, 214 N.J. 199, 229 (2013). Thus, we must "give deference to the actions and factual findings of local boards and may not disturb such findings unless they [are] arbitrary, capricious, or unreasonable." Jacoby, 442 N.J. Super. at 462. Local zoning boards have "peculiar knowledge of local

conditions and must be [afforded] wide latitude in the exercise of delegated discretion." Kramer v. Bd. of Adj., 45 N.J. 268, 296 (1965).

The Municipal Land Use Law (MLUL) gives zoning boards the power to grant or deny use, density, and height variances. N.J.S.A. 40:55D-70(d). The MLUL provides, in pertinent part, that the Board may grant a variance "[i]n particular cases for special reasons" for a use prohibited in the district, an increase in density permitted pursuant to N.J.S.A. 40:55D-4, and an increase in height of a building exceeding ten feet or ten percent of the maximum height allowed in the district. N.J.S.A. 40:55D-70(d). N.J.S.A. 40:55D-70 requires a weighing of positive criteria or "special reasons," and negative criteria showing that "such variance or other relief can be granted without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance." See Sica v. Bd. of Adj., 127 N.J. 152, 155 (1992).

Here, plaintiff sought a density variance pursuant to N.J.S.A. 40:55D-70(d)(5). Density variances "are subject generally to the same weighing analysis that applies to other (d) variances. However, . . . if variances of this type are requested in connection with a permitted use, a lower threshold . . . is appropriate." Price v. Himeji, 214 N.J. 263, 296 (2013) (citation omitted). This

17

less demanding standard "reflect[s] the significant differences between prohibited uses, on the one hand," and permissible uses that deviate from an ordinance, on the other hand. Coventry Square, Inc. v. Westwood Zoning Bd. of Adj., 138 N.J. 285, 297 (1994).

"Such requests need not demonstrate that the property is 'particularly suitable to more intensive development' in order to prove 'special reasons' under the MLUL." Grubbs, 389 N.J. Super. at 389 (quoting Randolph Town Ctr. Assocs., L.P. v. Twp. of Randolph, 324 N.J. Super. 412, 416 (App. Div. 1999)). "Rather, in considering such applications, zoning boards of adjustment should focus their attention on whether the applicant's proofs demonstrate 'that the site will accommodate the problems associated with a proposed use with [a greater density] than permitted by the ordinance.'" Ibid. (quoting Randoph Town Ctr, 324 N.J. Super. at 417) (alteration in original).

> A successful applicant for a density variance therefore must show that despite the proposed increase in density above the zone's restrictions, and thus, the increased intensity in the use of the site, the project nonetheless served one or more of the purposes of zoning and was consistent with the overall goals of the MLUL.[3]
>
> [Ibid.]

---

[3] The overall goals or purposes of the MLUL are set forth in N.J.S.A. 40:55D-2.

18                                                                    A-3864-22

"For example, it might be shown that the project promoted a more desirable visual environment through development of otherwise underdeveloped or vacant property . . . ." Id. at 390. "A successful applicant might [also] demonstrate that the project's construction with the requested density variance better promotes the character of the neighborhood or better preserves property values in the adjacent community." Ibid.

"Likewise, in addressing the so-called negative criteria, the applicant would need to demonstrate that the increase in density would not have a more detrimental [e]ffect on the neighborhood than construction of the project in a manner consistent with the zone's restrictions." Ibid. "For example, the applicant might demonstrate that the increased proposed density was only minimally greater than the permitted density in the zone or in adjacent areas." Ibid. "The applicant might [also] show that it was unlikely that a minimal increase intensity would create a 'substantial detriment' to nearby properties." Ibid. (citing Yahnel v. Bd. of Adjustment of Jamesburg, 79 N.J. Super 509, 519 (App. Div.), certif. denied, 41 N.J. 116 (1963)).

Plaintiff also sought a variance for the number of on-site parking spaces under N.J.S.A. 40:55D-70(c)(2), often called flexible "c" variance, which authorizes variances where the purposes of the MLUL would be advanced, and

19

the benefits of the deviation outweigh any detriments. Kaufmann v. Plan. Bd. for Warren Twp., 110 N.J. 551, 558-60 (1988). N.J.S.A. 40:55D-70(c)(2) provides, in relevant part:

> [W]here in an application or appeal relating to a specific piece of property the purposes of this act . . . would be advanced by a deviation from the zoning ordinance requirements and the benefits of the deviation would substantially outweigh any detriment, [the Board may] grant a variance to allow departure from regulations . . . provided, however, that the fact that a proposed use is an inherently beneficial use shall not be dispositive of a decision on a variance under this subsection . . . .

"A (c)(2) variance requires a balancing of the benefits and detriments from the grant of the variance." Bressman v. Gash, 131 N.J. 517, 523 (1993). The analysis focuses on advancing the purposes of the MLUL and the benefits to the community. In sum, the application for a variance under (c)(2) requires:

> (1) [That it] relate[] to a specific piece of property; (2) that the purposes of the [MLUL] would be advanced by a deviation from the zoning ordinance requirement; (3) that the variance can be granted without substantial detriment to the public good; (4) that the benefits of the deviation would substantially outweigh any detriment[;] and (5) that the variance will not substantially impair the intent and purpose of the zone plan and zoning ordinance.
>
> [Cox et al., N.J. Zoning & Land Use Administration § 29-3.3 at 435 (2023) (citations omitted).]

A zoning board's "resolution must contain sufficient findings, based on the proofs submitted, to satisfy a reviewing court that the board has analyzed the applicant's variance request in accordance with the statute and in light of the municipality's master plan and zoning ordinances." N.Y. SMSA v. Bd. of Adj., 370 N.J. Super. 319, 333 (App. Div. 2004). We reject memorializing resolutions that "summarize, in a very cursory fashion, the testimony presented by [the applicant's] witnesses, and reiterate[] selected comments by [b]oard members and the public." Ibid.; see also Cox & Koenig, N.J. Zoning & Land Use Administration § 19:7-2 (2024) (stating "mere recitals of testimony are not 'findings'").

We are satisfied the court correctly determined the Board failed to make sufficient findings supported by competent evidence in the record to support its denial of plaintiff's application. The Board relied primarily on the testimony and report of its planner, Hartmann, for its findings that: (1) the proposed mechanical parking is insufficient for the project; (2) the limited public parking in the area will not accommodate the additional vehicles the project will bring to the immediate neighborhood; and (3) the project cannot accommodate the problems created by the increased density, specifically with respect to site and

21

traffic circulation, off-street parking, and the impact on the surrounding properties.

On the issue of parking, plaintiff provided expert analysis and testimony establishing the project would be a very low traffic generator, resulting in "less than five trips during" peak hours. According to plaintiff's experts, this insignificant change in traffic would not have a detrimental impact on traffic in the area. Likewise, plaintiff offered expert testimony in support of its contention that the twelve parking spaces proposed would be sufficient for the project.

As the court found, the Board simply declared that it disagreed with plaintiff's experts without any competent factual basis for doing so. The Board relied on Hartmann who is not a traffic engineer, did not undertake any sort of parking or traffic study, and did not have any factual basis for her opinions on parking or traffic.

In fact, Hartmann's opinion on the sufficiency of the proposed parking spaces was based primarily on her contention that the mechanical parking system was "not recognized by" Weehawken. Hartmann did not offer any support for that position or for her decision to disregard plaintiff's expert testimony on the utility and increasingly common acceptance of such parking systems. Likewise, Hartmann did not offer any evidence to contradict or

22

disprove plaintiff's expert testimony that the project would be a very low traffic generator and would have not detrimental effect on traffic in the area. Instead, as the court noted, Hartmann and the Board simply declared that they disagreed and concluded, without any factual basis, that the project would bring too many additional vehicles to the immediate neighborhood.

In a similar manner, Hartmann and the Board disregarded plaintiff's expert testimony that the twenty-four-foot-wide driveway would be able to accommodate delivery, maintenance, and repair vehicles. Again, without providing any factual basis, Hartmann and the Board simply declared plaintiff's experts were wrong and the project could not accommodate the additional vehicles.

As to density, plaintiff's expert planner testified the proposed density is similar to other properties in the area and cited several examples in the immediate vicinity. Hartmann again simply disagreed, contending only that the property at 85 Maple Avenue did have a similar density, but also had significantly more parking. Hartmann did not provide any factual basis for her contention that the Maple Avenue property had significantly more parking and did not address the other properties in the area identified by plaintiff's expert. Again, Hartmann's opinion regarding density was based in large part on her

23

opinions regarding traffic and parking, that were factually unsupported and directly contradicted by plaintiff's experts.

As the court aptly noted, the Board's amended resolution was based on the personal disagreement of the Board members with plaintiff's evidence and experts, not on competent facts in the record. Because the amended resolution sets forth only bald conclusions rather than sufficient findings supported by facts in the record, we conclude the court determined correctly the Board's decision denying plaintiff's application was arbitrary, capricious, and unreasonable.

We are not persuaded by the Board's argument that the court rejected Hartmann's testimony because she was not a traffic expert. The court did not reject Hartmann's testimony. Instead, it gave her testimony less weight because her opinions were not supported by facts in the record and were contradicted by plaintiff's three experts whose opinions were properly supported.

Finally, we are satisfied plaintiff set forth evidence sufficient to support its requests for variance relief. As to the density variance, plaintiff established the project: (1) promotes the general welfare by creating new more efficient and modern housing and advances the goal of providing a desirable living environment; (2) proposes a use of the property more in harmony with the area than leaving the two lots with the existing non-conforming conditions; (3)

24

promotes a more desirable visual environment; and (4) promotes the efficient use of land. Plaintiff also established the proposed density was consistent with the density of other properties in the immediate area and would not create a substantial detriment to nearby properties. As to the parking variance, plaintiff established through unrebutted expert testimony the proposed mechanical parking system is reliable, effective, and is commonly being implemented in similar projects. In addition, plaintiff established the twelve proposed spots would be sufficient for the project. The Board failed to offer any competent evidence to refute plaintiff's supporting expert testimony and evidence.

To the extent we have not addressed any of the Board's remaining arguments, it is because they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION