RICHARD KAUFMANN AND LAURA KAUFMANN, HIS WIFE, PLAINTIFFS–RESPONDENTS, v. PLANNING BOARD FOR THE TOWNSHIP OF WARREN, DOUGLAS OTTE AND MARY LOU OTTE, DEFENDANTS–APPELLANTS.

Argued February 1, 1988—Decided June 21, 1988.

552

*Joseph E. Murray,* for appellants Douglas Otte, et al. (*McDonough, Murray & Korn,* attorneys; *Joseph E. Murray,* of counsel; *Jonathan E. Drill,* on the brief).

*Eugene W. Jacobs,* for appellant Planning Bd. for the Tp. of Warren (*Handelman & Jacobs,* attorneys).

*Alan L. Wohl,* for respondents (*Alan L. Wohl,* attorney; *Alan L. Wohl* and *Brian H. Feuerlicht,* on the brief).

*Daniel S. Bernstein* and *Fred G. Stickel, III,* submitted a brief on behalf of *amici curiae* N.J. State League of Municipalities and New Jersey Institute of Mun. Attys. (*Bernstein, Hoffman & Clark,* and *Fred G. Stickel,* attorneys).

The opinion of the Court was delivered by

O'HERN, Justice.

This is the first time that we have addressed the provisions of *N.J.S.A.* 40:55D–70c(2), a variance provision added to the Municipal Land Use Law (MLUL) by the comprehensive amendments of *L.* 1984, *c.* 20 (hereafter the c(2) variance). The provision allows a variance for certain dimensional requirements when the purposes of the MLUL would be advanced, the benefits of the deviation would substantially outweigh any detriment, and the relief can be granted without substantial detriment to the public good and without substantial impairment of the zone plan. In this case a planning board granted a variance for a two-lot minor subdivision with conforming (in-deed, excess) lot area but with a deviation from road frontage on the lots and a minor side-yard deviation to accommodate a garage existing on the proposed new lot. We hold that this variance is justified by the new authority vested in zoning and planning boards under the MLUL to grant such dimensional variances without a showing of hardship. Accordingly, we reverse the judgment below invalidating the municipal approval

I

This is an action in lieu of prerogative writs brought under *Rule* 4:69 challenging the Township of Warren Planning Board's granting of a c(2) variance pursuant to *N.J.S.A.* 40:55D–70c(2).

Defendants Douglas and Mary Lou Otte own Lot 8, Block 621 as set forth on the Warren Township Tax Map. Their lot has 167.48 feet of frontage on Hillcrest Road and an average depth of 392 feet, and covers approximately 1.59 acres or 65,000 square feet to the center line of Hillcrest Road. The property is in the R–20 residential zone, which requires a minimum lot area of 20,000 square feet, a minimum lot width of 100 feet, and a minimum side yard of twenty feet. Their residence is in the southwestern corner of the lot, with a detached frame garage and a circular above-ground swimming pool nearby. The plaintiffs, Richard and Laura Kaufmann, own Lot 13B in Block 621, a single-family property adjoining the Ottes to the east. They share a common rear line.

The Ottes initially filed an application in 1984 with the Warren Township Planning Board to subdivide their property into two lots, each of which was to be used as a site for a one-family house. That application proposed a "flag lot" configuration; one conforming lot would have had 142.4 feet of frontage on Hillcrest Road, and another lot, partially located behind the first, would have had a frontage of only 25.08 feet on the road. The plaintiffs and other neighbors objected to the Ottes' initial application, complaining of the visual impact of one lot being developed behind the other. The Planning Board denied the variance.

In response, the Ottes submitted to the Planning Board a revised subdivision plan proposing two nonconforming lots, each with a width or frontage of 83.74 feet. Each of the parcels would conform to the lot area requirement: one lot would be comprised of 20,000 square feet; the other parcel would contain 41,445 square feet and include the Ottes' new

residence together with the existing frame garage, which would be located fifteen feet from the proposed new sideline. The Ottes were to retain ownership of both parcels, but planned to rent the original lot and existing house. The original lot would also be given an easement to use the garage on the Ottes' new and larger lot. The adjacent swimming pool on the larger lot would be removed. The objectors contended that the revised application would create the identical visual impact of the "flag lot" that was previously denied: one property being developed behind the other.

The Ottes' proofs were that the surrounding neighborhood consists of a mix of older and newer residential homes with the vast majority of lots having frontage widths of less than 100 feet. When the Ottes bought their home in 1972, the east side of Hillcrest Road was zoned for 1.5-acre lots, the size of their lot. Subsequently, in the early 1980s, the Township reduced the minimum lot size on the easterly side of Hillcrest Road to 20,000 square feet, thus providing and planning for more intense use of the land. A number of the properties in the neighborhood are "flag lots" with access to Hillcrest Road either by easement over, or deed of, a portion of another lot having a frontage width of less than the required 100 feet. Fifteen homes in the neighborhood are located on lots having less than eighty-five feet in frontage width. The properties located to the north and south of the Ottes' lot each contain two residences despite the fact that those lots are not subdivided and have insufficient frontage to obtain subdivision approval without obtaining variances. A few lots in the neighborhood have frontage widths of as little as fifty feet. The evidence before the Planning Board revealed that the nonconforming lots on the west side of Hillcrest, at 1200 to 1800 feet, are substantially deeper than the Ottes' 392 feet.

The Ottes' variance application proceeded on two bases: the familiar c(1) or "hardship" standard, *N.J.S.A.* 40:55D-70c(1), and the newly enacted c(2) variance standard, *N.J.S.A.* 40:55D-70c(2). The Planning Board granted the Ottes' subdivision and

variance application by voice vote and thereafter entered a written resolution dated April 23, 1985. The Board found that the proposed lots would be similar in character to the other lots in the area; that the Ottes' lot was much larger and wider than those; and that because of the physical features of the Ottes' lot a strict application of the dimension requirement would result in "peculiar and exceptional practical difficulty to the applicant," or a c(1) "hardship." In addition, the Board examined the purposes of zoning as set forth in *N.J.S.A.* 40:55D–2(a), to guide use or development of lands to promote general welfare; (e), to establish appropriate population densities; and (g), to provide sufficient space to meet public needs. It concluded that a variance under c(2) would advance these goals and that the benefit of this deviation would substantially outweigh any resulting harm or detriment. Because the remaining lots either were too small or were already subdivided, the Board foresaw no "domino effect" from its decision.

On plaintiffs' suit, the Law Division reversed the Planning Board and set aside the variance. It rejected the finding of c(1) "hardship," reasoning that the property was readily marketable as a one-family property and that the requirement that an owner use more land than the minimum does not constitute undue hardship. (In their petition of review before us, the defendants do not challenge the Law Division's ruling on c(1) hardship.) On the c(2) variance, the court held that since the purpose of area, width, and depth requirements is to preserve the essential residential character of the community by preventing overcrowding and undue concentration of population, a deviation from those standards could not be said to advance the purposes of zoning, and that in any event there was no showing that any benefit would substantially outweigh the detriment. In an unpublished *per curiam* opinion the Appellate Division affirmed, substantially for the reasons expressed by the trial court. We granted certification to review the petitions of the applicant and the Planning Board. 108 *N.J.* 580 (1987).

## II

In three recent cases, *Medici v. BPR Co.*, 107 *N.J.* 1 (1987), *Davis Enterprises v. Karpf*, 105 *N.J.* 476 (1987), and *PRB Enterprises, Inc. v. South Brunswick Planning Bd.*, 105 *N.J.* 1 (1987), we considered in detail the variance and site-plan powers of municipal zoning and planning boards. In each of these cases, we emphasized the new approaches that the MLUL has taken with respect to land development.

In *Medici, supra,* 107 *N.J.* at 19–20, 526 *A.*2d 109, we noted the increasing "shift of authority" to the local boards to effectuate municipal land use policy. In particular, such boards may now *grant,* not just recommend, use variances, *N.J.S.A.* 40:55D–70d. Their grants of other approvals, such as those for site plans and subdivisions, are not reviewable by governing bodies; and use variances themselves are not reviewable unless the governing body enacts a review ordinance. *N.J.S.A.* 40:55D–17a.

Concomitant with this enhanced authority, we have increasingly emphasized that planning, and not *ad hoc* decision-making, is the cornerstone of sound governmental policy in this area. *See Riggs v. Township of Long Beach*, 109 *N.J.* 601, 619–22 (1988) (Handler, J., concurring). Thus, in *Medici, supra,* we required "in addition to proof of special reasons, an enhanced quality of proof and clear and specific findings by the board of adjustment that the variance sought is not inconsistent with the intent and purpose of the master plan and zoning ordinance." 107 *N.J.* at 21. The requirements of periodic reevaluation of the municipal master plans and development regulations, *N.J.S.A.* 40:55D–89, –89.1, and of annual reports and recommendations from boards of adjustment, *N.J.S.A.* 40:55D–70.1, help to ensure government by ordinance and not by variance. *See also PRB Enterprises, supra,* 105 *N.J.* at 9 (municipality may not delegate zoning power to planning boards by imprecise definition of permitted use).

At the same time, we have not signaled a shift in emphasis from the traditional role of courts in reviewing planning or zoning board action. "We do not sit in judgment on whether the envisioned [zoning change] is wise or unwise." *Davis Enterprises, supra,* 105 *N.J.* at 487 (quoting *Foster–Hyatt Group, Inc. v. West Caldwell Planning Bd.,* 174 *N.J.Super.* 10, 14 (App Div.1980)). Such land-use decisions are entrusted to the sound discretion of the municipal boards, which are to be guided by the positive and negative criteria set forth in the enabling statutes.

## III

Consideration of the positive and negative criteria of the c(2) variance requires a review of its legislative history. Historically, in New Jersey variance and planning activities were separated by function of the boards. In *Loechner v. Campoli,* 49 *N.J.* 504, 512 (1967), this Court held that a subdivision plan had to be submitted initially to the planning board and then, if variances were necessary, to the zoning board of adjustment. Thus, before 1975, an applicant seeking developmental approvals that required variances faced a "ping-pong" session of appearances before the two boards, each with a different perspective. H. Moskowitz, "The Planning Board Under the New Municipal Land Use Law," *The New Jersey Municipal Land Use Law: A Series of Monographs,* 3.4 (1976). One of the salient features of the MLUL was the "one-stop shopping" provided by its concept of ancillary jurisdiction in each board. The planning board has ancillary jurisdiction over subsection c variances if the proposed development also requires subdivision, site plan, or conditional use approval, *N.J.S.A.* 40:55D–60; but if the proposed development requires a subsection d variance, the board of adjustment has ancillary jurisdiction over any required approval of the subdivision, site plan, or conditional use. *N.J.S.A.* 40:55D–76b.

With minor exceptions the MLUL incorporated the essential features of pre–1975 development law in New Jersey by con-

tinuing two types of variances familiarly known as the "c" or "hardship" variance and the "d" or "special reasons" variance. *See N.J.S.A.* 40:55D–70c and d. Prior to the enactment of the MLUL in 1975, the two standards were codified at *N.J.S.A.* 40:55–39c and d. Under prior law the "special reasons" standard was designed for applications proposing "a structure or use in a district restricted against such a structure or use." *N.J.S.A.* 40:55–39d (1967) (repealed *L.* 1975, *c.* 291, § 80). Consequently, dimensional variances were traditionally processed and litigated under the "hardship" standard. The "hardship" provision, subsection c, was nearly identical to the MLUL version, currently *N.J.S.A.* 40:55D–70c(1), and thus pre–1975 hardship variance case law remained a relevant backdrop against which the c(2) variance was adopted. *Commons v. Westwood Zoning Bd. of Adjustment*, 81 *N.J.* 597, 604 (1980). Similarly, the MLUL essentially incorporated the "special reasons" standard and negative criteria provision.

In 1979, however, the Legislature broadened subsection d to authorize variances for "special reasons * * * from regulations pursuant to [the zoning article of the MLUL], including, *but not limited to,* allowing a structure or use in a district restricted against such structure or use." *L.* 1979, *c.* 216 (emphasis added). In other words, dimensional variances were swept into the d variance rubric. *Michelotti Realty Co. v. Saddle Brook Township Zoning Bd.*, 191 *N.J.Super.* 568, 571 (App.Div.1983); *Hudanich v. Avalon*, 183 *N.J.Super.* 244, 263 (Law Div.1981). But the combination of (1) the 1979 amendment to the MLUL, which clarified that "special reasons" variances under subsection d included more than use variances, and (2) the "very restrictive interpretation by the courts of the 'hardship' variance power in subsection c." cases was seen as producing an unanticipated shift of applications from planning boards to zoning boards. Sponsor's Statement to Assembly Bill No. 1169, *L.* 1984, *c.* 20.

The Legislature expressed the concern that although subdivision, site plan, and planning aspects were dominant in many of

these applications, because of the interplay between the subsection c and d provisions, the "boards of adjustment [were] being overburdened with applications for which the planning boards [were] more suitable." *Id.* at 20. Zoning boards were using their subsection d power to grant dimensional variances without a showing of hardship. In addition, since the various claims for relief from dimensional requirements were swept into the (d) variance format, many more applications were subject to the requirement that five out of the full seven board of adjustment members had to vote in favor of proposed variances. *Id.* at 21. In the sponsor's view, "[t]he solution [was] to broaden the c. variance by adding alternative criteria therefor and to limit the d. variance to major specific types of variances." *Id.* at 21.

This goal was accomplished in 1984 by two amendments. First, to the subsection c variance provisions with their historic "hardship" basis related to the shape of the property, its topographical conditions, physical features, or other extraordinary and exceptional situations, the Legislature added a new paragraph:

> (2) where in an application or appeal relating to a specific piece of property the purposes of this act would be advanced by a deviation from the zoning ordinance requirements and the benefits of the deviation would substantially outweigh any detriment, [the board of adjustment may] grant a variance to allow departure from regulations pursuant to article 8 of this act [Zoning Article of the MLUL] provided, however, that no variance from those departures enumerated in subsection d. of this section shall be granted under the subsection. [*L.*1984, *c.* 20, § 12.]

At the same time the Legislature amended the subsection d variance to limit the zoning board's primary variance jurisdiction to cases involving (1) use variances; (2) expansion of nonconforming uses; (3) deviation from conditional use requirements; (4) increase in permitted floor area ratios; and (5) increase in permitted density except in the case of detached one- or two-dwelling-unit buildings that are either (a) an isolated undersized lot, or (b) lots resulting from a minor subdivision. *L.*1984, *c.* 20, § 12. In essence, the Legislature added to subsection c a very narrow band of cases in which the standard would fall somewhere between the traditional standards of

"hardship," on the one hand, and "special reasons," on the other. By virtue of their ancillary jurisdiction, planning boards, like zoning boards, may exercise this power in applications properly before them. However, the purposes of the MLUL must still be advanced by the requested deviation from zoning requirements.

Given this background, we may ask what specific criteria the Legislature had in mind when it redefined the qualifications for a very limited class of nonhardship variances in which "the purposes of [the MLUL] would be advanced by a deviation" from zoning standards and with the benefits substantially outweighing any corresponding detriment.

Contemporary commentators furnished us with prototypical examples of variance requests that came quickly to mind: (1) the applicant who wishes to add a room to an existing one-family home; because the lot is undersized, there cannot be constructed an addition that will conform to the zoning requirements; (2) the applicant who wishes a side-yard variance for a garage alongside the home; if the garage were constructed in the back of the home, it would conform to the ordinance; (3) the applicant who wishes to add a spare room for an aged parent and requires a dimensional variance (not at issue here is the question of separate housekeeping); (4) the application for a commercial use that conforms in all respects except for the location of a sign. D. Bernstein, *A New Variance—The Flexible 'c'*, *N.J.L.J.*, Nov. 29, 1984, at 17, col. 3.

The minimal impact of these examples is reassuring but none of them (except perhaps for the sign) appears particularly to advance the purposes of zoning. The use of these examples to illustrate the c(2) variance may be occasioned less by their aptness than by the confusion that has crept into zoning law regarding the degree of hardship necessary to sustain a dimensional variance. Commentators, noting that "the two types of 'variances' have become confused," thought that in New Jersey it might be easier to get a "special reasons" variance than a "hardship" variance. *See* 5 N. Williams, *American Land*

*Planning Law,* § 138.03 at 106 (1985 Rev.). The equation of subsection c "hardship" with confiscation was a legal rubric for deciding when a zoning board *had to* grant a "c" variance, not for cataloguing the only circumstances in which the board *could* grant the relief. It was meant to mark the plimsoll line of discretion, not its entire content: the point at which the measure of discretion, like a vessel reaching overload, had to tip.

In his concurring opinion in *Davis Enterprises, supra,* 105 *N.J.* at 488, Justice Stein, noting the variety of factors that can support a claim of "hardship," explained the relationship between confiscation and "hardship":

> [A] lot with unusual topography may provide a basis for a variance from restrictions as to maximum height. A narrow lot may in some instances justify a sideyard variance. The existence of a nonconforming structure may justify a variance from maximum land-coverage requirements. The availability of public parking on adjacent property may be a factor that would support a variance from parking requirements. In each of these examples, the claimed hardship need not result in the inability to make *any* use of the property. Typically, the contention is that the strict enforcement of the zoning ordinance, in view of that property's unique characteristics, imposes a hardship that may inhibit *the extent* to which the property can be used.[1] [*Id.* at 493 (Stein, J., concurring) (emphasis supplied).]

This confusion about the meaning of c(1) "hardship" should not slosh over into the interpretation of the c(2) standard. The c(2) variance is entirely different, and the Legislature has made one thing clear about it: the grant must be rooted in the purposes of zoning and planning itself and must advance the purposes of the MLUL.

In refining the legislative content of the phrase—to advance the purposes of the MLUL—it helps to remember the develop-

---

[1] Thus Justice Stein concluded that an offer to purchase is irrelevant to consideration of variances from regulations that inhibit *"the extent* to which property can be used." *Davis Enterprises v. Karpf,* 105 *N.J.* 476, 493–94 (1987) (Stein, J., concurring) (emphasis supplied). The majority had no occasion to consider the point, noting that "[t]he Board found, notwithstanding the offer, that the property was subject to the hardship necessary to support the grant of the variance." 105 *N.J.* at 487. In other words, inutility, the confiscatory absence of any use, is not the sole predicate for a "c" variance.

ment of the "special reasons" standard. The content of that legislative provision did not spring full-blown from the language of the statute. Rather, it evolved from a case-by-case analysis. Justice Stein traced that growth in *Medici, supra,* 107 *N.J.* at 9–18:

> [The "special reasons" standard] has generally been defined in relation to the purposes of zoning, *see N.J.S.A.* 40:55D–2, and our decisions have emphasized the promotion of the general welfare as the zoning purpose that most clearly amplifies the meaning of special reasons. *See Andrews v. Ocean Township, supra,* 30 *N.J.* at [245] 250. Although certain commercial uses may inherently serve the general welfare in a particular community, the typical commercial use can be better described as a convenience to its patrons than as an inherent benefit to the general welfare. For such uses, any benefit to the general welfare derives not from the use itself but from the development of a site in the community that is particularly appropriate for that very enterprise. [*Medici, supra,* 107 *N.J.* at 18.]

We think that because of its lesser moment the c(2) variance need not be so closely confined to the general welfare. Rather, it may take its meaning as well from the other specific purposes of zoning set forth in the MLUL. For example, *N.J.S.A.* 40:55D–2j intends the prevention of "degradation of the environment through improper use of land." Thus a property crossed by a stream might call for an adjustment of side or front yards better to protect the stream bed, or a stand of trees might call for a shifting of lot sizes (if a minor subdivision). In some cases a height variance might better serve to conserve "open space * * * and valuable natural resources." *N.J.S.A.* 40:55D–2j.

By definition, then, no c(2) variance should be granted when merely the purposes of the owner will be advanced. The grant of approval must actually benefit the community in that it represents a better zoning alternative for the property. The focus of a c(2) case, then, will be not on the characteristics of the land that, in light of current zoning requirements, create a "hardship" on the owner warranting a *relaxation* of standards, but on the characteristics of the land that present an opportunity for *improved* zoning and planning that will benefit the community.

■ As the trial court recognized, the board is not free to grant variances from existing requirements just because it disagrees with those requirements. But we would not go so far as to conclude that every deviation runs counter to the purposes of zoning. Obviously, the Legislature contemplated that deviations from zoning requirements without "hardship" could advance the purposes of zoning, else it would not have enacted the c(2) provision. By rooting the c(2) variance in the purposes of the MLUL, the Legislature has confined the discretion of boards: they cannot rewrite ordinances to suit the owner or their own idea of what municipal development regulations should be. Rather, the board should seek, as we think this Board did, to effectuate the goals of the community as expressed through its zoning and planning ordinances.

■ In this case, then, although the record does not articulate such findings, we are satisfied that the record sustains a conclusion that the proposed development would put the land more in conformity with the community's development plans and thereby would advance the purposes of zoning. The point is made that the plaintiffs' planner was vague, if not inconclusive, about how the development would benefit the general welfare under *N.J.S.A.* 40:55D–2a. He recognized that he "could not summarize a half hour's testimony in two minutes," but he reemphasized that he had mentioned the shape, size and frontage of the property, as well as the topography and the treed areas, as factors that supported the grant. He had testified that this made for "good planning in the portion of the [T]ownship." *N.J.S.A.* 40:55D–2e contemplates as a purpose of zoning the promotion of "appropriate population densities." This area of the community was one in which the Township sought to encourage a more intense use of the land. It was discouraging large lot zoning in this area of town. Were the variance not granted, this lot would have had 325% of the norm (65,000 square feet versus 20,000 square feet in total lot area), in contrast to the 16% less than the norm requested by the variance (84 feet of frontage versus 100 feet). The Ottes,

long-time residents of the community, recited that a selling point for the 1980 down-zoning was that "we could all benefit because we [would] have the possibility of building another home on our property." They wanted to stay in their community but they wanted a new home. In addition, the configuration of the subdivision and the location of the dwelling retained the woodlands on the lot, thus fulfilling a goal of *N.J.S.A.* 40:55D-2g.

We believe that on this record the benefits of zoning (more harmonious lot sizes) could be seen as substantially outweighing any detriment. Given that the establishment of appropriate population densities is a recognized purpose of zoning, the grant of this variance to permit this property to be divided into two lots conforming in respect of area, but marginally insufficient in respect of the frontage and side-yard requirements, is also consistent with that statutory objective.

We take it that the negative criteria of the c(2) variance require "statutory focus * * * on the surrounding properties," as did the first prong of the d variance's negative criteria, *Medici, supra,* 107 *N.J.* at 22 n. 12, as well as any possible detriment to the zoning plan, the second prong. A c(2) variance stands if, after adequate proofs are presented, the board without arbitrariness concludes that the harms, if any, are substantially outweighed by the benefits. The Planning Board made that finding here, and the record contained expert proof from a planner that no detriment would ensue. That the planner did not recite the weighing process is not fatal to the decision. Plaintiffs recognize that expert testimony is not required in all instances to sustain a board finding. *Tomko v. Vissers,* 21 *N.J.* 226, 238 (1956); *see also Kunzler v. Hoffman,* 48 *N.J.* 277, 285 (1966) (a physician could offer evidence to a board that a hospital would not cause detrimental effect upon the neighborhood). Hence, to the extent that the challenged variance projects use of property that conforms with the actual development and planning applicable within the zone—more so than would the denial of the proposed use—and because in this case

the benefits envisaged from the grant of the variance were found substantially to outweigh any detriment to the surrounding properties or to the zoning plan, we believe that the variance should be sustained.

This case, then, is but one example of the c(2) power. The Legislature undoubtedly intended through the c(2) variance to vest a larger measure of discretion in local boards in a limited area of cases. Courts are obliged to respect that grant of power. This power is restrained both by its inherent limitation to the affirmative advancement of zoning purposes and by the negative criteria of *N.J.S.A.* 40:55D–70. As we have noted, the key to sound municipal decision-making is a clear statement of reasons for the grant or denial of a variance. Although we have not required that degree of clarity here, it will help to resolve future cases.

The judgment of the Appellate Division is reversed, and the resolution of the Planning Board is declared valid.

*For reversal*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI, and STEIN—7.

*For affirmance*—None.