**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3744-18T1

JANEK PATEL,

     Plaintiff,

and

A&D CONVENIENCE STORE,
INC.,

     Plaintiff-Appellant,

v.

CITY OF SOUTH AMBOY
PLANNING BOARD and
DEVIMY EQUITIES, LLC,

     Defendants-Respondents.

_____

Submitted February 24, 2020 – Decided March 9, 2020

Before Judges Sabatino and Sumners.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-4101-18.

Gasiorowski & Holobinko, attorneys for appellant (Ronald S. Gasiorowski, on the brief).

Respondents have not filed a brief.

PER CURIAM

Plaintiffs, Janek Patel and his company A&D Convenience Store, objected to approvals granted by the South Amboy Planning Board to a developer that wishes to build a convenience store next to plaintiffs' own convenience store. The Law Division rejected all of plaintiffs' arguments to set aside the Board's approvals. A&D Convenience Store appeals that decision. For the reasons that follow, we affirm.

I.

We derive the following pertinent facts and procedural history from the proceedings before the Planning Board and the trial court.

The proposed project would be built within a redevelopment zone. In February 2002, the South Amboy governing body adopted the Broadway/Main Street Redevelopment Plan. The Plan covers a roughly ten-acre area of land, comprising forty-six parcels fronting Broadway and Main Street in South Amboy.

In June 2017, defendant DeVimy Equities, LLC, the developer and the property's contract purchaser, filed an application for preliminary and final site plan approval for a proposed 7-11 convenience store. The store would be

located on a parcel at the corner of Main Street and Broadway in South Amboy. Appellant concedes the proposed convenience store is an approved commercial use within the redevelopment zone.

The property currently has an unused building that, according to appellant, was previously used as an antique store and auto upholstery store. The remainder of the parcel is presently a parking lot.

Appellant operates a Krauszer's convenience store adjacent to one side of the proposed 7-11. The two establishments would be competitors, although, unlike the proposed 7-11, the Krauszer's has a liquor license.

The Planning Board held four public hearings on DeVimy's proposed development from November 2017 through early March 2018. Following revisions made to the original application during the hearing process, the Planning Board ultimately considered the following variances and waivers as part of the overall application:

> A variance for maximum impervious coverage, which would be 82.7% rather than the required 80%.
>
> A waiver for parking space size from the required ten feet by twenty feet to a proposed nine feet by eighteen feet.
>
> A waiver for minimum parking space distance from the building, from the required twenty feet to six feet.

A-3744-18T1

A waiver of the requirement for a loading area for delivery vehicles.

A waiver to increase fence height from a statutory maximum of four feet to a proposed six feet.

A waiver for driveway distance from an intersection from a required fifty feet to a proposed forty-four feet.

A waiver to construct signs when signs are generally not permitted in the zone.

Several expert witnesses respectively testified at the hearings; some on behalf of the applicant DeVimy and others for the objectors who oppose the project. There is no indication either party objected to the qualifications of any of the testifying experts. In addition, several local residents spoke at the hearings.

Josh Sewald—DeVimy's Engineer

Josh Sewald, a site design engineer, testified for DeVimy. He described the current layout of the property, DeVimy's proposal, and the required variances.

Sewald opined that the variance for nine-by-eighteen-foot parking spaces, rather than the ten-by-twenty-foot requirement, were appropriate because the 7-11 customers would be making quick trips for small purchases without shopping carts, and would not require additional space. He also testified that a six-foot

distance between the parking spaces and the building was "very standard and prototypical" for small convenience stores like this one. He noted that the Planning Board engineer's report agreed with both of these conclusions.

Sewald explained that the store would be serviced by a tractor trailer delivery during "off-peak" hours "once-a-week" for thirty to forty-five minutes. Sewald also described newspaper deliveries and garbage pickup, and how the site would accommodate these services.

Regarding the loading zone variance, Sewald testified that because a 7-11 is a small store, its deliveries would be made through the front door and do not require a formal loading zone. He testified that during the once-a-week, thirty-minute delivery time, a delivery truck would take up most of the parking spaces on the property, but other vehicles would be able to maneuver around the truck to enter and exit the property. In response to questions from the Planning Board, Sewald stated that there would be fourteen overall deliveries a week, including the tractor trailer delivery, but the remainder of the deliveries would be in vans that could occupy a regular parking space.

On cross-examination by plaintiffs' counsel, Sewald acknowledged that one parking space would be blocked during trash pickups. He also conceded that nearly all the parking spaces directly in front of the store would be blocked

by the tractor trailer deliveries. He noted that, if the spaces in front were initially occupied, the trucks could circulate the block and reenter the parking lot.

According to Sewald, the current property has 94.6 percent impervious coverage, and under DeVimy's proposal that coverage would be reduced. The reduced coverage would comply with state and local requirements and be a "positive to the drainage situation on the property."

<u>Justin Taylor – DeVimy's Traffic Expert</u>

Justin Taylor testified for DeVimy as a professional traffic operations engineer. Applying concepts from the Institute of Transportation Engineers, Taylor projected the expected customer traffic into the 7-11 store and evaluated whether the adjacent roads could handle the traffic changes. As part of his review, Taylor examined the proposed site approximately six to seven times.

According to Taylor, traffic on adjacent roads would "circulate and function well" with the proposed development. He opined that the increase in traffic would be "negligible." In particular, Taylor estimated that "60 to 70 percent of the traffic associated with the project would already be there", because the 7-11 would serve as a stop along customer's preexisting commute routes. He expected about thirty-one vehicles would use the property during morning peak hours, and twenty-four or twenty-five during evening peak hours.

A-3744-18T1

Taylor contended the roads could accommodate these changes with no more than a two-second increased delay in traffic flow. Taylor further testified the driveways into and out of the building would operate "safely and efficiently with the adjacent traffic."

Taylor also addressed traffic and parking within the parking lot itself. He concluded that the proposed nine-by-eighteen-foot parking spaces were appropriate and would not be a safety issue, and that the proposed six-foot distance between the parking spots and the building was "prototypical."

According to Taylor, 7-11 stores around the nation rely on front-loading deliveries without a loading zone. He noted deliveries would occur at off-peak times, or between the morning and evening rush hours. The lot was designed so a tractor trailer would not need to swing out into oncoming traffic when entering the parking lot, and thus would not impede the flow of traffic in the opposite direction.

On cross-examination, Taylor conceded that a truck would need to cross into the opposite lane to exit the property. He also acknowledged trucks would block most of the front entrance to the store while making deliveries.

<u>Christine Cofone – DeVimy's Planning Expert</u>

Christine Cofone, a licensed professional planner, testified for DeVimy about the benefits of the proposed project and the requested variances.

Cofone noted that the 7-11 was a permitted use in the redevelopment zone. She acknowledged the project's impervious coverage exceeded legal requirements, but it would nonetheless reduce the current coverage from 96.4 percent to 82.7 percent. She further testified that proposed landscaping and green space for the project would improve the "curb appeal" of the property.

Regarding the fence height variance, Cofone testified that the proposed six-foot fence beneficially would give neighbors more screening from the store.

Cofone testified that it was common for other similarly sized stores in the area to not have loading zones. She asserted that the parking size and location variances were "prevailing industry standard practices of a use of this type," and would result in a "safe and efficient circulation plan." She opined that requiring the site to comply with these requirements would result in a less efficient use of land and interrupt traffic circulation. With a variance for smaller spaces, the developer could introduce more green space onto the site.

As to overall benefits of the project, Cofone asserted the 7-11 would serve the goals of revitalizing the Broadway/Main Street area. The business would

8

also improve the tax base by upgrading existing commercial uses from a preexisting abandoned property.

Cofone identified other benefits of the proposal compared to the property's current use, including reducing impervious coverage, providing better screening for neighboring residential properties, and improving the aesthetic appeal of the lot. She testified there were no negative impacts from the proposed project, and that the extent of the variances would be "de minimis."[1]

Andrew Thomas – Plaintiffs' Planning Expert

As part of the objectors' case, plaintiffs called Andrew Thomas, a planning expert.

Thomas opined that nine-by-eighteen-foot parking spaces were inappropriate for a convenience store like the one proposed, particularly because a larger parking space could more easily accommodate delivery vehicles. Thomas further stated the proposed development would cause traffic disruption in the redevelopment zone due to the location of its trash and recycling containers, the inadequate parking space sizes, and the lack of loading area. He

---

[1] We will discuss, infra, Cofone's testimony concerning buffer zone issues, as well as that of plaintiffs' planning expert.

also contended that the parking and circulation issues, and lack of buffer zone, would be a detriment to the surrounding neighborhood.

Craig Robbins – Truck Driver Witness

Plaintiffs called Craig Robbins to testify in his capacity as a professional truck driver. Based on his experience driving a tractor trailer, he stated such a vehicle could not enter or exit the property without swinging into the oncoming traffic lane.

Alexander Litwornia – Plaintiffs' Traffic & Noise Expert

Plaintiffs called Alexander Litwornia as a traffic and noise expert. Litwornia asserted that a garbage truck picking up trash from the dumpster on the proposed property would "consistently violate" noise codes. He estimated the noise of the truck from readings he had heard on other garbage trucks. However, Litwornia had not studied the baseline noise level on Broadway at the proposed location.

Litwornia also voiced concerns about parking and traffic issues. He testified that in order to have a truck exit the property safely, three off-site parking spaces on Broadway would need to be removed to accommodate its turning path. According to appellant, this conflicted with DeVimy's expert testimony about traffic flows. Litwornia contended that DeVimy should have

conducted what he called a "gap study" to properly determine the flow of traffic to and from the proposed development.

Given the site location and traffic volume, Litwornia maintained traffic circulation to and from the site would be unsafe. He also testified the site plan was in violation of state, county, and local regulations governing the locations of driveways near residential properties.

Upon considering these competing presentations, on March 28, 2018, the Planning Board narrowly voted, five to four, to approve DeVimy's application. A corresponding resolution of approval was adopted on May 23, 2018.

II.

Plaintiffs challenged the Planning Board's action by filing in the Law Division a complaint in lieu of prerogative writs in July 2018. After plaintiffs slightly amended their complaint, the Planning Board and DeVimy filed answers. Following an initial case management conference with the trial court, the matter was temporarily remanded to allow the Planning Board to revise its resolution of approval. The resolution was amended accordingly, and the case returned to the Law Division.

Following briefing and argument, the trial court issued an oral opinion on March 18, 2019 rejecting plaintiffs' various challenges to the Planning Board's

11

approvals. Although the court recognized certain aspects of the case were of concern, on the whole the court found the Planning Board had complied with the law and reasonably applied its expertise and knowledge of local conditions.

The present appeal by plaintiff A&D Convenience Store ensued. For reasons that are not disclosed, counsel for DeVimy and for the Planning Board each wrote letters to this court advising that they would not file briefs or participate in the appeal. Hence, we have reviewed the issues raised on appeal without the benefit of opposing counsel's advocacy.

III.

On appeal, the objector to the project argues:

POINT ONE

THE BOARD ARBITRARILY AND UNFAIRLY LIMITED AND INTERFERED WITH THE PLAINTIFF/OBJECTOR'S PRESENTATION AND CASE, AND THAT SHOULD INVALIDATE THE PROCEEDING AND THIS BOARD APPROVAL DETERMINATION.

POINT TWO

THE BOARD ERRED BOTH PROCEDURALLY AND SUBSTANTIVELY IN ITS CONSIDERATION AND DETERMINATION AS TO THE NEED FOR A 10 FOOT BUFFER ON THE SITE AS PER SECTION 53:79(A)(5)(a).

A. Procedural Errors in Buffer Determination

1. Board Planner's Repeated Interjection as to the Legal Issue of Buffer Requirement.

2. Improper Preclusion of Evidence as to Prior Buffer Determination and Application.

POINT THREE

THE BOARD APPROVAL WAS ARBITRARY AS THE BOARD FAILED TO PROPERLY ASSESS THE ADVERSE IMPACTS OF DEFICIENT PARKING AND LOADING FACILITIES AT THIS INTENSE COMMERCIAL USE.

POINT FOUR

THE BOARD'S REVISED RESOLUTION REMAINS INADEQUATE AND CONCLUSIONARY, AND CONFIRMS THE LACK OF ADEQUATE PROOFS AND FINDINGS SUPPORTING THE BOARD ACTION.

We approach the issues on appeal guided by well-established principles. Generally, judicial review of a decision of a municipal planning board or board of adjustment is highly deferential. "[T]he law presumes that boards of adjustment and municipal governing bodies will act fairly and with proper motives and for valid reasons [and] will be set aside only when it is arbitrary, capricious and unreasonable." Kramer v. Bd. of Adjustment, Sea Girt, 45 N.J. 268, 296 (1965); see also Friends of Peapack-Gladstone, 407 N.J. Super. 404, 424 (App. Div. 2009) (reiterating the judiciary's limited standard of review of

13

local land use decisions).  The plaintiff has the burden of proving the land use decision is arbitrary, capricious and unreasonable.  See Dunbar Homes, Inc. v. Zoning Bd. of Adjustment of Twp. of Franklin, 233 N.J. 546, 558 (2018).  A reviewing court may not substitute its judgment "for the proper exercise of the Board's discretion," CBS Outdoor, Inc. v. Borough of Lebanon Planning Bd./Bd. of Adjustment, 414 N.J. Super. 563, 578 (App. Div. 2010).  However, a municipal board's interpretation of the law is reviewed de novo and not entitled to deference.  Dunbar Homes, 233 N.J. at 559.

Among other things, DeVimy sought "(c)(2)" variances under N.J.S.A. 40:55D-70(c)(2).  That subsection provides, in pertinent part, that:

> (2) where in an application or appeal relating to a specific piece of property [it is shown that] the purposes of this act . . . would be advanced by a deviation from the zoning ordinance requirements and the benefits of the deviation would substantially outweigh any detriment, [the Board may] grant a variance to allow departure from regulations pursuant to article 8 of this act . . . .
>
> [N.J.S.A. 40:55D-70(c)(2).]

As this court explained when construing the Municipal Land Use Law ("MLUL") in Wilson v. Brick Twp. Zoning Bd. of Adj., 405 N.J. Super. 189, 198 (App. Div. 2009), the application for a (c)(2) requires:

(1) [that it] relates to a specific piece of property; (2) that the purposes of the Municipal Land Use Law would be advanced by a deviation from the zoning ordinance requirement; (3) that the variance can be granted without substantial detriment to the public good; (4) that the benefits of the deviation would substantially outweigh any detriment and (5) that the variance will not substantially impair the intent and purpose of the zone plan and zoning ordinance.

[Ibid. (citing William M. Cox, New Jersey Zoning and Land Use Administration, § 6-3.3 at 143 (2008)).]

"[N]o (c)(2) variance should be granted when merely the purposes of the owner will be advanced." Kaufmann v. Planning Bd. for Warren, 110 N.J. 551, 563 (1988). "The grant of approval must actually benefit the community in that it represents a better zoning alternative for the property." Ibid. Hence, the focus of a subsection (c)(2) case ordinarily is "on the characteristics of the land that present an opportunity for improved zoning and planning that will benefit the community." Ibid.; see also Cicchino v. Twp. of Berkeley Heights Planning Bd., 237 N.J. Super. 175, 181-83 (App. Div. 1989).

DeVimy also requested several waivers, apart from the variances. In general, a planning board has the authority to waive certain requirements for site plan approval where their application would result in "undue hardship" because of conditions unique to the property. N.J.S.A. 40:55D-51(b). The primary distinction between waivers and variances is that waivers are exceptions from

15

requirements contained in a site plan ordinance, whereas variances are exceptions from a municipal zoning ordinance. See, e.g., Wawa Food Mkt. v. Planning Bd. of Borough of Ship Bottom, 227 N.J. Super. 29, 34 (App. Div. 1988) (describing the distinction between waivers and variances); see also Cox & Koenig, New Jersey Zoning & Land Use Administration, § 23-8 (2019).

## A.

We first discuss the issues concerning whether DeVimy needed a buffer zone variance.

Appellant argues the Planning Board erred because it concluded DeVimy was not required to provide a ten-foot buffer between the proposed development and an adjacent residential property.[2] We reject its effort to invalidate the project on this basis.

The parcel at issue in this appeal borders residential property on the southwestern side of the property line. This is apparently the side, rather than the rear, of the proposed development.

DeVimy's planning expert, Sewald, testified that the proposed building would be two feet from the adjoining residential property line. The 7-11 would

---

[2] The residential property owner has not participated in the litigation, nor did that owner appear at the hearings to object to the lack of a buffer.

be separated from the adjacent residential property by a six-foot high fence, which was intended to prevent access from one property to another and shield the residential property from the commercial space. Appellant argues reversal is required because the Planning Board failed to recognize that a buffer was required and failed to discuss it in its resolution approving DeVimy's proposal.

In considering the appellant's challenge, we recognize that a municipal board's interpretation of the law is reviewed de novo. Dunbar Homes, 233 N.J. at 559; Atl. Container, Inc. v. Twp. of Eagleswood Planning Bd., 321 N.J. Super. 261, 269 (App. Div. 1999) (noting "interpretation of an ordinance is essentially a legal issue . . . . As such, the conclusions of the [planning board], as well as the Law Division, are not entitled to any particular deference").

Despite the de novo review of municipal ordinances, this court has observed that, because a planning board is required to approve a master plan as well as a zoning ordinance, "the Planning Board can be expected to have more than a passing knowledge of the legislative intent at the time of the enactment." Ibid. Therefore, our courts have given "deference to a municipality's informed interpretation of its ordinances, while nevertheless construing the ordinance de novo." DePetro v. Twp. of Wayne Planning Bd., 367 N.J. Super. 161, 174 (App. Div. 2004).

Interpretation of an ordinance is guided by the same principles of interpretation as any other statute or code. State, Twp. of Pennsauken v. Schad, 160 N.J. 156, 170 (1999) ("The established rules of statutory construction govern the interpretation of a municipal ordinance."). "The meaning derived from that language controls if it is clear and unambiguous." Ibid. Where a code is ambiguous, a court should consider "the statute's purpose, legislative history, and statutory context to ascertain the legislature's intent." Ibid.; See also DePetro, 367 N.J. Super. at 174 (noting that a reviewing court's interpretation of an ordinance should be guided by "the local legislative intent").

That said, "the personal motivation of individual lawmakers is irrelevant to the interpretation of the law." Cox & Koenig, § 26-2.3 at 565; See also Tasca v. Bd. of Trustees, Police & Firemen's Ret. Sys., 458 N.J. Super. 47, 56 (App. Div. 2019) (quoting Tumpson v. Farina, 218 N.J. 450, (2014)) ("We will not presume that the Legislature intended a result different from what is indicated by the plain language or add a qualification to a statute that the Legislature chose to omit.").

Here, the Planning Board did not discuss the need for a ten-foot buffer zone, or a variance from that requirement, in the "Conclusions" portion of its resolution. The resolution did, however, include in its narrative section a

summary of the opinion of its professional planner, Angelo Valetutto, that there was no buffering requirement in the redevelopment zone. It also included references to the contrasting testimony of plaintiffs' planner, Thomas, who thought a buffer zone was necessary. Appellant contends the Redevelopment Plan and Land Development Ordinance require such explicit consideration.

The Redevelopment Plan includes certain bulk requirements. Relevant here, the setback requirements are:

> d. Minimum front yard setback: 0 feet
> e. Minimum side yard setback: 0 feet
> f. Minimum total side yard setback: 0 feet
> g. Minimum rear yard setback: 25 feet

The Redevelopment Plan does not include any language about buffer zones with adjoining properties.

The Redevelopment Plan also explains how it interacts with the municipality's Land Development Ordinance:

> The objectives, standards and requirements contained in the Broadway/Main Street Redevelopment Plan, shall regulate development within the Redevelopment Area and take precedent over the Land Development Ordinance of the City of South Amboy. For standards not specifically addressed within this Broadway/Main Street Redevelopment Plan, the Land Development Ordinance shall apply. The regulations for the zone or zones permitting the most similar types of use or uses shall be applied. These requirements may be varied by

the Planning Board pursuant to N.J.S.A. 40:55D-1 et seq.

[(Emphasis added).]

The Land Development Ordinance includes a section on "Design and Performance Standards." Land Development Ordinance, Article XVII.[3] Appellant argues these standards apply to all zones within the municipality, including the Redevelopment Zone. Included in this section of the Ordinance is a general requirement for buffer zones between commercial and residential properties:

(5) Buffers.

(a) Buffer areas shall require site plan approval and are required along all lot lines and street lines which separate a nonresidential use from either an existing residential use or residential zoning district. Buffer areas shall be developed in an aesthetic manner for the primary purposes of screening views and reducing noise perception beyond the lot. Buffer widths shall be measured horizontally and perpendicularly to lot and street lines. No structure, activity, storage of materials or parking of vehicles shall be permitted in a buffer area. The standards for the location and design of buffer areas are intended to provide flexibility in order to provide effective buffers. The location and design of buffers shall consider the use of the portion of the property being screened, the distance between the use and the adjoining property line, differences in elevations, the type of buffer such as dense planting,

_____

[3] Available at: https://clerkshq.com/Southamboy-nj.

existing woods, a wall or fence, buffer height, buffer width and other combinations of man-made and natural features. The buffer shall be designed, planted, graded, landscaped and developed with the general guideline that the closer a use or activity is to a property line or the more intense the use, the more effective the buffer area must be in obscuring light and vision and reducing noise beyond the lot, as determined by the administrating Board.

(b) <u>A minimum of one-half (1/2) of the periphery that requires a buffer shall have a buffer at least ten (10) feet wide which shall be designed, planted, graded, landscaped and developed to obscure the activities of the site from view.</u> In addition, the periphery that requires a buffer shall consist of at least the following: fencing or walls in a landscaped area not less than ten (10) feet wide; a landscaped area with at least five (5) feet high growth. A building with a setback of at least two hundred (200) feet with a grade of less than twenty percent (20%) shall have groups of plantings and trees located within this setback area to enhance some architectural feature(s) of the structure as well as offer a break to large open areas, but with no other use permitted in this yard area. A parking area setback shall be landscaped as required under the off-street parking provisions of this chapter. If in the judgment of the approving authority any of these alternate provisions will not provide sufficient buffers for the portion of the site proposed, the approving authority may require the site plan to be modified to show the extension of the ten-foot buffer area outlined above or require that the proposed alternatives be landscaped differently or be relocated until, in the approving authority's judgment, they provide the desired buffering effect.

[Section 53-79(A)(5)(a-b) (emphasis added).]

Furthermore, the Land Development Ordinance defines a "buffer area" as:

> BUFFER AREA — A dense and continuous landscaped screening area, planted and maintained, consisting of fences, massed trees and shrubs of such species and size as will produce a sufficient density to obscure or confine throughout all seasons automobile headlight glare, site noise, windblown debris and other typical and frequent nuisance problems, etc., as well as create an aesthetically pleasing and attractive view to mask or obscure the use, function or structure located upon the site.
>
> [Land Development Ordinance, Definitions, Article VII].

The Land Development Ordinance does not define the term "setbacks."[4]

The need for a buffer zone was discussed extensively at the hearings. Plaintiffs' attorney cross-examined DeVimy's expert Cofone at length on the subject. He asked her whether the zoning ordinance required a buffer zone with adjoining residential properties. She testified that, because the Redevelopment Zone has zero-foot front and side yard setback requirements, and because there was a conscious decision in the Plan to "build flexibility into the redevelopment process" and encourage new development, it was reasonable to read the enactments as not requiring a buffer zone.

---

[4] The MLUL does not provide a definition of either "setback" or "buffer." See N.J.S.A. 40:55D-3 to -7.

Cofone opined that the Redevelopment Plan governed this particular use, and that the municipal ordinance would not be implicated unless there was a use variance requirement that the Redevelopment Plan did not cover. She concluded in her opinion as a professional planner, that "the use is permitted in the [R]edevelopment [P]lan, and that the [R]edevelopment [P]lan has bulk standards in it to regulate the use."

Valetutto, the Board's professional planner, who represented he was the author of the Redevelopment Plan, testified[5] at the hearings about the report he had prepared concerning DeVimy's application. He explained his intent when he was drafting the Redevelopment Plan:

> MR. VALETUTTO: Well, in our report, we did not comment on buffer, because we didn't think it was applicable. When you have a redevelopment plan that has [zero] setback lines, it's kind of hard to say you can build to the property line, but we want a buffer. We didn't deem it appropriate. We don't believe it's applicable what you're trying to do, in terms of saying

---

[5] As an incidental issue, we reject appellant's contention that Valetutto was not sworn as a witness. The record for the first hearing on November 20, 2017 shows otherwise. We also reject appellant's claim that Valetutto was not qualified to provide expert testimony or that he lacked sufficient personal knowledge of the matters he addressed. See Concerned Citizens of Princeton, Inc. v. Mayor & Council of Borough of Princeton, 370 N.J. Super. 429, 463–64 (App. Div. 2004) (finding no statutory requirement for such a witness to be qualified as an expert to testify). Valetutto also clearly had personal knowledge of the issues.

there should be a buffer because of the proximity. Even though it was 2002 or so when I did the report, it's still – still what my intention was, and why we didn't bring it up in our report.

Plaintiffs' expert planner, Thomas, testified to the contrary. Thomas opined the Zoning Ordinance requires a landscaped ten-foot buffer with adjoining residential properties. He noted that, by comparison, DeVimy had requested several bulk variances and waivers for design standards that were in the Land Development Ordinance, not the Redevelopment Plan, including "driveway and drive aisle requirements, parking requirements, loading requirements, other buffer fence and screening requirements and sign requirements." He concluded that the buffer requirement was as applicable as any of the other standards.

Valetutto agreed that the Redevelopment Plan states that, if it does not cover a standard, the Zoning Ordinance governs. However, according to Valetutto, "when you have zero setback with no differentiation as to whether it's next to a residential, commercial or industrial tract . . . there is . . . nothing [in the Plan] to indicate that we require a buffer for those setbacks."

Appellant contends the "buffer" requirements are distinct from "setback" requirements. Appellant maintains the "buffer" requirement of Section 53-79(A)(5) is applicable to all zones and, because buffers are not "specifically

addressed" in the Redevelopment Plan, it plainly requires that the "Land Development Ordinance <u>shall</u> apply." Hence, this site required a ten-foot landscaped buffer between the lot and an adjoining residential property.

The trial court recognized that a "setback" is distinct from a "buffer zone." It also accepted plaintiffs' argument that, because the Redevelopment Plan does not address buffer zones, the Land Development Ordinance is applicable and "some sort of buffer is required." However, the court interpreted the Land Development Ordinance buffer zone requirement, specifically Section 53-79(A)(5)(b), to permit a Planning Board to determine what kinds of buffer would be appropriate and effective. The court concluded the Planning Board permissibly allowed DeVimy to construct a six-foot fence with the adjoining property, that a fence was a permitted type of buffer under the Ordinance, and therefore the fence satisfied the buffer requirement.

Although we agree with the trial judge no ten-foot buffer was required here, we do not subscribe fully to the court's reasoning. Section 53-79(A)(5)(b) requires that at least half of a commercial/residential property line "shall" have a ten-foot-wide buffer and, "[i]n addition," other buffer elements such as fences, walls, or vegetation. To the extent it contemplates modifications to the buffer, it does not suggest the ten-foot requirement is interchangeable with other types

of buffers, although, like any other structural feature, a variance could presumably be granted. The notion that the Planning Board considered and approved a buffer in the form of a higher fence cannot be squared with the Board's written resolution. Although the Planning Board could have considered and granted a variance for this requirement, it appears it determined there was no need to do so.

Where a land use provision is ambiguous, it is reasonable to look to the legislative intent. Schad, 160 N.J. at 170. The Redevelopment Plan lists goals that both support and conflict with a buffer zone requirement. As DeVimy's expert planner noted, one goal of the Plan is the expansion and development of commercial areas in the zone. On the other hand, the Plan seeks to "minimize any disruption or inconvenience to any of the residents" in the vicinity of the Redevelopment Plan. The stated goals therefore do not resolve the issue.

That said, an objective examination of the Plan – viewed in its context – supports an interpretation that a buffer was not required. The map of the Redevelopment Zone contained in the record shows it is a long, thin stretch of properties along Broadway in South Amboy mostly surrounded by a residential zone. Virtually all of the commercial developments in this Redevelopment Zone would abut a residential property. It would be counterintuitive to permit zero-

foot setbacks for properties in this zone, allowing development to occur up to the front and side property lines, but simultaneously require a ten-foot buffer zone for most, if not all properties, where "[n]o structure, activity, storage of materials or parking of vehicles shall be permitted." Section 53-79(A)(5).

To be sure, we are not bound by the views of a single town professional, even the purported drafter of the Redevelopment Plan, as indicative of legislative intent. Nevertheless, the Redevelopment Plan declares there are zero-foot front and side setbacks, and does not distinguish between residential and commercial uses, both of which are permitted within the Redevelopment Zone. Moreover, the zone envisions "residential over top of permitted" commercial uses. (Emphasis added). On the whole, the Zone allows overlapping residential and commercial uses, and is surrounded by a residential zone, but still allows no front and side building setbacks. This does not logically mesh with the imposition of a ten-foot commercial/residential buffer zone.

Despite the omission of analysis in its written conclusions, the Planning Board evidently concluded the buffer zone was not required. No Board members raised the issue at the vote approving DeVimy's application. It is reasonable to find the zero-setback requirement in the Redevelopment Zone was intended to remove the buffer zone requirement. Hence, there was no error in the Board's

decision to not consider the issue in the application process. Consequently, we affirm the Law Division's denial of relief on this ground, albeit for different reasons than those articulated by the judge. Isko v. Planning Bd. of Livingston Twp., 51 N.J. 162, 174-75 (1968) (appellate court may affirm judgment on different grounds than set forth below); see also State v. Armour, 446 N.J. Super. 295, 310 (App. Div. 2016) (appellate court may affirm judgment on different grounds than set forth below).

B.

Appellant contends the Board should have admitted into evidence a review letter from 2001 for a proposed Dunkin' Donuts located on the same site as the present application.[6] Appellant concedes that 2001 application predates the 2002 adoption of the Redevelopment Plan.

Plaintiffs' counsel attempted to admit the 2001 application letter into evidence during his examination of his expert planner. The evidence purportedly showed that in 2001, when the property was in a residential zone, a Dunkin Donuts was proposed on the site and, as part of the application process, a buffer zone was required.

---

[6] Apparently, the Dunkin' Donuts project was never built.

The Planning Board's attorney advised this 2001 letter should be excluded because that application was for a use variance, not a bulk variance, because it was seventeen years old and preceded the Redevelopment Plan, and because it was prepared by a different Board planner. He concluded it would only confuse issues for the Planning Board and was irrelevant to the current proposal, particularly considering the Redevelopment Plan adopted the following year. The Board Chairman agreed that the letter was irrelevant and did not admit it into evidence.

The trial court found that, because the Redevelopment Plan was not in effect at the time of the 2001 Dunkin' Donuts application, it was reasonable to exclude the document from coming into evidence. We agree.

If the Redevelopment Plan had not been enacted, there is no question that a buffer zone would have been required. Therefore, a development application filed before the Redevelopment Plan existed merely states the obvious. It does not help resolve the interplay between that Plan and the Land Development Ordinance, and hence was reasonably excluded.

C.

Appellant maintains the application process was compromised because the Planning Board imposed "unfair and arbitrary limitations" on its counsel's

A-3744-18T1

ability to cross-examine DeVimy's experts and on his ability to present witnesses. These limits allegedly deprived plaintiffs of a "fair and level playing field" and in particular, they "could not fully explore the extent and impact of the proposal's parking and traffic impacts." We disagree.

Plaintiffs had more than a reasonably sufficient amount of time to present their case and to examine their own witnesses and the opposing witnesses. The Planning Board did not act arbitrarily in imposing reasonable time limitations in this case that spanned several hearings. N.J.S.A. 40:55D-10(d); See also Sea Girt, 45 N.J. 284–85 (holding procedures were not erroneous where they "did not prevent the objectors from setting forth either their legal or factual contentions"); Shim v. Washington Twp. Planning Bd., 298 N.J. Super. 395, 413 (App. Div. 1997) (upholding an application where the objectors "and their attorney had full opportunity to express their views during the entire hearing").

D.

Next, appellant contends the Planning Board failed to properly consider "the relevant evidence and issues as to traffic congestion, unsafe conditions, and severe traffic circulation issues arising from the proposed development." We disagree.

Appellant argues there was "essentially unrebutted" evidence by its experts that delivery trucks could not enter or exit the property without swinging into oncoming traffic, that box trucks would block parking spaces while deliveries were being made, and tractor trailer deliveries would entirely block the parking area while deliveries were being made. Appellant further contends that because their next-door convenience store already serves the community, there is no benefit to the new proposed 7-11. Appellant also notes eight residents spoke up in opposition to the plan. Appellant has argued the lack of a loading zone at the 7-11 would "cause congestion and safety problems."

The trial court concluded that both DeVimy and plaintiffs produced expert testimony about traffic and parking issues with the proposed development and that this was therefore a conventional case with "dueling experts." It noted DeVimy's experts had introduced evidence that the parking space size and distance from the building was safe and sufficient, the increased traffic flow would be minimal, and that there was no need for a loading zone. Although plaintiffs' experts disagreed with these findings, the trial court concluded there was sufficient evidence to support the Planning Board's approval of the requested variances and waivers.

"Where the testimony before the board is in conflict, the board must decide what the true facts are. The board has the choice of accepting or rejecting the testimony of witnesses, and where reasonably made, such decision is conclusive on appeal." Cox & Koenig, § 18-4.2; See also Sea Girt, 45 N.J. at 288 (1965) (same); Bd. of Educ. of City of Clifton v. Zoning Bd. of Adjustment of City of Clifton, 409 N.J. Super. 389, 434 (App. Div. 2009) (same, and citing cases).

Here, despite appellant's contention that the objector experts were "essentially unrebutted," DeVimy and plaintiffs each introduced competing expert testimony about the parking, traffic, and safety effects of the proposed development. The Board's written resolution summarized this testimony presented at the hearings. The Board concluded that pedestrian use of the property would be safe and efficient, that there would be minimal increased traffic delays due to the new project, that the smaller parking spaces would have a net positive benefit through reduced impervious coverage. It specifically found DeVimy's experts more credible than plaintiffs'. We agree with the trial court that there is enough evidence in the record for the Board to grant the parking and traffic related variances.

Appellant further argues DeVimy could have "eliminated or mitigated" the need for variances with "a smaller building or a less intense use" and, because they failed to explain why they did not explore these alternatives, it was effectively arbitrary and in error to grant the application. This is not a requirement for granting a (c)(2) variance. Jacoby v. Zoning Bd. of Adjustment of Borough of Englewood Cliffs, 442 N.J. Super. 450, 471 (App. Div. 2015); Wilson, 405 N.J. Super. at 198.[7] Accordingly, there was no requirement that DeVimy adopt a site plan that eliminated the need for variances or waivers and no error by the Planning Board or trial court for failing to impose such a requirement.

---

[7] The case that appellant cites in apparent support of its argument stands only for the proposition that it is better to require applicants to modify proposals to come into accordance with a zoning ordinance rather than reject the application altogether. ERG Container Servs., Inc. v. Bd. of Chosen Freeholders, 352 N.J. Super. 166, 176–77 (App. Div. 2002) ("[I]ntensification of a permitted use is more appropriately addressed by imposing appropriate conditions and restrictions in connection with site plan approval, rather than by completely barring the proposed use."). In fact, DeVimy did modify its initial proposal to eliminate the requirement for certain variances and to accommodate Planning Board concerns.

E.

Lastly, appellant argues the written resolution in support of DeVimy's application was inadequate and lacked proper findings. We reject this contention.

The MLUL requires that a municipal board memorialize in writing its "findings of fact and conclusions based thereon in each decision on any application for development." N.J.S.A. 40:55D-10(g). "[T]he resolution must contain sufficient findings, based on the proofs submitted, to satisfy a reviewing court that the board has analyzed the applicant's variance request in accordance with the statute and in light of the municipality's master plan and zoning ordinances." New York SMSA v. Bd. of Adjustment of Twp. of Weehawken, 370 N.J. Super. 319, 333 (App. Div. 2004). A "resolution cannot consist of a mere recital of testimony or conclusory statements couched in statutory language." Id. at 332-33.

As the trial court noted, the Planning Board initially submitted a written resolution which was remanded for further application after the parties agreed it was inadequate. The Board then submitted a revised and amplified resolution approving the application.

Appellant contends the revised decision is inadequate because it contains conclusory statements in favor of the application and the required variances. Specifically, appellant argues (1) it inadequately explains why the impervious coverage variance should be granted; (2) it "only vaguely" discusses the variance for smaller parking spaces; (3) it does not make specific findings about the loading area variance; (4) it does not make specific findings about the parking space distance requirement; and (5) does not explain its finding that there is "adequate parking."

The trial court found the revised resolution was sufficiently detailed. In the oral opinion, the court listed the findings that support this conclusion. First, the resolution described how changes to the application rendered the variance for number of parking spaces moot. The court found the decision to grant the reduced parking space size was supported by the record, citing the testimony of the applicant and objector experts. The court also noted there was testimony that smaller parking spaces would allow more green space on the property, providing a benefit by reducing impervious coverage. Finding number ten, which declared that the variances for fence height, loading zone, and parking distance were proper because they resulted in "more efficient use of the land[,]" was supported by the record, because these changes again allowed for a reduced

impervious surface area. The court also noted there was testimony described in the written resolution that a loading zone was not necessary for a store of this size. The court found that objector testimony that box trucks would have trouble fitting into parking spaces was mere "conjecture." The court concluded that the resolution's statement that "pedestrian use is safe and efficient" was supported by evidence in the record from DeVimy's expert and was enough to grant the parking space distance variance. He also noted that there was no testimony to the contrary.

On the whole, the trial court concluded the revised resolution's findings were supported by the record, and that the resolution specifically noted the Board found DeVimy's experts more credible than those of the plaintiffs. The Planning Board adequately described benefits from the proposed development and variances, specifically a more efficient use of the property and reduced impervious coverage.

As the trial court recognized, the revised resolution could be better organized in laying out its approval of the overall application and the specific variances and waivers requested. Nevertheless, given the strong deference accorded to planning boards, Sea Girt, 45 N.J. at 296, the record provides support for the Board's decision to approve the proposal and grant the requested

variances. DeVimy's proofs, as summarized in the written resolution, support the findings that the variances would advance the public goals of reduced impervious coverage and promote a more efficient use of the property without substantial detriment. <u>Kaufmann</u>, 110 N.J. at 565 (1988) ("A c(2) variance stands if, after adequate proofs are presented, the board without arbitrariness concludes that the harms, if any, are substantially outweighed by the benefits.").

All other arguments raised on appeal lack sufficient merit to warrant discussion. <u>R.</u> 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

37